UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| BRENDA BRENYAH, | § | |
|     Plaintiff | § | |
| | § | |
| V. | § | Civil Action No. 21-cv-87 |
| | § | |
| | § | |
| COLUMBIA HOSPITAL CORPORATION | § | |
| OF BAY AREA d/b/a/ CORPUS CHRISTI | § | |
| MEDICAL CENTER, | § | |
|     Defendant. | § | **JURY TRIAL REQUESTED** |

## PLAINTIFF'S ORIGINAL COMPLAINT

Comes now Plaintiff, Brenda Brenyah, by and through counsel, and in support of her claims against the above-named Defendant, Columbia Hospital Corporation of Bay Area d/b/a Corpus Christi Medical Center, respectfully states:

## NATURE OF THE ACTION

1. This lawsuit presents claims for creation of a hostile work environment, unlawful harassment, disparate treatment and discrimination based upon race discrimination and retaliation for opposing and reporting the unlawful race discrimination in violation of 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991.

## PARTIES

2. Plaintiff, Brenda Brenyah, is an individual residing in Corpus Christi, Nueces County, Texas. Ms. Brenyah was born in Ghana, her ethnicity and race is Ashanti/Akan/Black African and she is a citizen of the United States.

3. Defendant, Columbia Hospital Corporation of Bay Area d/b/a Corpus Christi

Medical Center (hereinafter referred to as "CCMC"), is a Texas corporation organized under the laws of the State of Texas and doing business in Nueces County, Texas. It may be served by serving its registered agent: CT Corporation System, 1999 Bryan St., Suite 900,  Dallas, Texas 75201-3136. CCMC is an independent legal entity and it is an affiliate under the corporate umbrella of HCA Healthcare, Inc. which owns and operates 185 hospitals and approximately 2,000 sites of care, including surgery centers, free standing emergency rooms, urgent care centers and physician clinics in 21 states and the United Kingdom. HCA Healthcare, Inc. is a publicly traded entity.

## JURISDICTION AND VENUE

4.  This Court has jurisdiction over this action by reason of 28 U.S.C. §1331 and §1343, in that Plaintiff, pursuant to 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991, seeks to redress race discrimination and retaliation she experienced at the hands of Defendant. This lawsuit has been timely filed within the applicable statute of limitations. Venue is proper pursuant to 28 U.S.C. §1391 because the Defendant does business within the geographical boundaries of the United States District Court for the Southern District of Texas, Corpus Christi, Division.

## FACTS

5.  Ms. Brenyah's race is Black African because her ancestry, her ethnicity and ethnic characteristics, and her physical, cultural and linguistic characteristics are of the Black African people. She is fluent in English and speaks with a Ghanian accent.

2

6. Ms. Brenyah is a registered nurse licensed by the Texas Board of Nursing and she is an experienced healthcare worker who has worked in variety of medical field positions such as working as a certified medication aide at the Dallas County Jail (Lew Sterrett Justice Center) located in Dallas, Texas. Ms. Brenyah also worked at a Level II Trauma Emergency Facility as an ER Tech II at United Regional Hospital located at Wichita Falls.  Ms. Brenyah earned a Bachelors of Science in Nursing degree from Midwestern State University. Ms. Brenyah has been a registered nurse since January 2013 and she has worked at various hospitals and units such as medical surgical unit, oncology, cardiac and in an ICU step-down unit. She has additional healthcare certifications such as a Basic Life Support certificate and Advanced Cardio Life Support certification. Mrs. Brenyah is also a member of the Texas Nurses Association and the American Nurses Association.

8. Ms. Brenyah was hired to work at CCMC at its location at 7101 S Padre Island Dr, Corpus Christi, TX. 78412, which is known as the Bay Area Campus, as a registered nurse on March 20, 2017 and, pursuant to the Collective Bargaining Agreement in effect, Ms. Brenyah's initial 90 day probationary period ended on June 18, 2017.  Ms. Brenyah completed her initial orientation at Doctor's Regional Campus which is also part of HCA Healthcare, Inc.

9. Starting on May 2,  2017, Ms. Brenyah was discriminated against and harassed based upon her race, Black African, and Black employees, who have similar physical racial characteristics as Ms. Brenyah, were also discriminated against. The discrimination directed

3

against Ms. Brenyah was because she is genetically part of an ethnically and physiognomically distinctive subgrouping of homo sapiens. Further, the race discrimination which Ms. Brenyah suffered and witnessed, was intentional, severe and pervasive and not only was Ms. Brenyah subjected to this abusive conduct, but she witnessed and was aware of other Black African and Black employees who were subjected to similar racially discriminatory conduct. After Ms. Brenyah opposed and reported this race discrimination to CCMC, she was the subject of life-threatening retaliation by charge nurses and management at CCMC.

10. Starting on or about May 2, 2017 and continuing during her employment, Ms. Brenyah, was subject to racial harassment and discrimination. Some examples of this racial harassment and discrimination were that she was told by the charge nurse, Monica Rivera, who is Hispanic, that her "African food" stunk; Ms. Rivera told Ms. Brenyah that she prefers Filipino nurses to Black nurses; Ms. Rivera stated that she considered that a Black nurse, David, is no longer Black because he is married to a Filipino (in effect, she was saving that David "upgraded" his race through his marriage); and having her African accent mocked. Other Black African and Black employees such as Lawrence Dike, who was a certified nurse assistant and who is also of Black African ancestry (Nigerian), and Michelle Cummings, who is a Black nurse, were also subjected to the same or similar racial harassment including racial slurs.  Also, other employees engaged in the racial discrimination such as Angela Guerra, who was a Hispanic charge nurse, by frequently making racially charged comments in the

break room while speaking with employees.  An example of these comments are that she prefers Filipino nurses over Black nurses because Black people like to play the race card. This harassment was pervasive as it occurred several times a week and it was also meant to dehumanize Black African and Black employees.  Further, the harassment altered the terms, conditions, or privileges of Ms. Brenyah's employment. CCMC admitted as part of their investigation that Ms. Rivera stated allegedly "in jest" that she said, "because you go to the Philippines all the time you're not even black anymore" in reference to David, a Black nurse. Ms. Rivera did not make any comments of this nature to Ms. Brenyah or Mr. Dike "in jest." Mr. Dike was being discriminated against on almost every shift including having to endure racial slurs from patients such as "nigger." This was reported to Ms. Zamora, but she just made excuses and allowed Mr. Dike to be subjected to discrimination by patients without taking any appropriate action.  The racial harassment of Mr. Dike by patients was reported to Mr. Sewell and he responded that it was o.k. for charge nurses to allow the patient to discriminate against Mr. Dike because of his race. The comments were offensive, frequent and created a racially hostile work environment for Black African and Black employees.

11. In approximately the middle of May 2017, Ms. Brenyah was subjected to harassment based upon her race by Marissa Zamora, who is a Hispanic female who was the unit manager, by being falsely accused of abandoning her patients by going downstairs to "hang-out" at the cafeteria and she claimed that the charge nurse, Ms. Guerra told her that two people witnessed it. The identities of the alleged two witnesses were never disclosed to

Ms. Brenyah or to any investigative authority.  Ms. Brenyah explained to Ms. Zamora that the allegations were not true and she provided easily verifiable information to show that the allegation was false. Ms. Brenyah told Ms. Zamora that she worked the night shift and the cafeteria was not open during the hours at issue. Therefore, the allegation was clearly false as Ms. Brenyah could not be at the cafeteria while it was closed.  Further, Ms. Brenyah asked Ms. Zamora to review the video surveillance of the area because it also supported that the allegation was false. Instead of considering the exonerating evidence which Ms. Brenyah presented to Ms. Zamora, Ms. Zamora disciplined Ms. Brenyah by issuing her a "coaching" for the alleged incident. CCMC stated that policy does not allow the review of security footage for employment matters, but only used for safety issues. Mr. Dike also asked CCMC to review security footage to exonerate him from racially inspired allegations made against him.  CCMC also refused to review the surveillance video in Mr. Dike's case.  However, contrary to this alleged policy, CCMC used security footage to frame Mr. Dike as a pretext to terminate his employment based upon his race. CCMC's illogical reasoning not to review the surveillance video supports pretext that the decisions were discriminatory. Further, CCMC failed to produce any contemporaneous records of the alleged event which also supports that the decision was a pretext for discrimination. The discipline of Ms. Brenyah was not warranted. It wrongfully branded her as a nurse who abandoned her patients. Abandoning a patient is a serious violation of the Standards of Nursing Practice and is a threat to Ms. Brenyah's nursing license. The purpose of this false allegations was to harass

Ms. Brenyah by threatening her livelihood and to set-her up for adverse action because of her race. "Coaching" is a step in the disciplinary process - meaning that it would be used to serve as a pretext to justify more harsh discipline against Ms. Brenyah in the future.

12. In regard to the trumped-up allegation that Ms. Brenyah "abandoned" her patients by going to the cafeteria, several nurses slept during working hours with CCMC Management's and Human Resource's knowledge. Sleeping on duty is abandonment of patients and it violates Texas Board of Nursing Rules, 22 TAC §217.11, Standards of Nursing Practice, and 22 TAC §217.12, Unprofessional Conduct. In regard to "sleeping on the job," the Texas Board of Nursing published the following in Position Statement 15.6 <u>Board Rules Associated with Alleged Patient "Abandonment"</u>:

> ...the rules most frequently applied to nursing practice concerns are 22 TAC§217.11, Standards of Nursing Practice, and 22 TAC §217.12, Unprofessional Conduct.
> ............
> Some actions may be more obvious examples of unprofessional conduct that could result in sanctions on the nurse's license. Examples of conduct that could lead to Board action on the nurse's license may include:
>
>> sleeping on the job, which effectively makes the nurse unavailable to observe the patient or respond to the patient's needs, even though the nurse is physically present;
>> .............

13. Despite violating Texas Nursing Standards by abandoning their patients by sleeping on duty verified by photographs submitted by Ms. Brenyah and Mr. Dike to CCMC Management and Human Resources, these non-Black African and non-Black nurses, and one CNA, were not disciplined in any form or fashion:

Monica Rivera, charge nurse, 3 West, CCMC, Hispanic and/or Mexican American.

Ryan Guerra, charge nurse, Bariatric Unit, CCMC, Hispanic and/or Mexican American.

Kenneth Go, RN, 3 West, CCMC, believed to be of Filipino origin.

Jim (last name unknown), RN, 4th Floor Telemetry Unit, CCMC, Hispanic and/or Mexican American.

Suzie (last name unknown), CNA, Labor & Deliver, CCMC, Hispanic and/or Mexican American.

Ms. Brenyah was treated disparately based upon her race, Black African, by receiving discipline for the trumped-up allegation of abandoning her patients, while persons of a different race, who actually abandoned their patients by sleeping on duty, were not disciplined.

14. Ms. Brenyah opposed race discrimination and reported these racially motivated incidents identified *supra* in paragraphs 9-13 to CCMC upper Management and Human Resources on or about the end of May 2017 or beginning of June 2017 including the fact that she believed that these actions were being taken against her because of her race and that there were a "clique" of individuals participating in the discrimination. These reports were made in good faith.

15. On June 18, 2017, Ms. Brenyah's 90 day probationary period should have concluded.

16. On June 21, 2017, Ms. Brenyah met with Vince Goodwine, Vice President of

8

Human Resources, and Jason Sewell, Director of Patient Care Services, about her reports of race discrimination and her opposition to race discrimination.  Mr. Goodwine and Mr. Sewell claimed that no other employee verified Ms. Brenyah's allegations that there was race discrimination in the department. Ms. Brenyah had evidence that other employees did, in fact, verify the discriminatory conduct within the work place to the CCMC Human Resources investigators. Specifically, Michelle Cummings, a Black female nurse, was called in by CCMC Human Resources investigators and she told them as part of the investigation into Ms. Brenyah's report of race discrimination that there were racial slurs being used and that she told the person that it was unprofessional.  She also told the Human Resources representatives that Ms. Rivera, charge nurse, spoke of David and his wife, who are an interracial couple - Filipino and Black. In effect, Ms. Rivera was saying that David "upgraded" his race through his marriage to a Filipino and that he was no longer Black.  As well, Mr. Dike had also made reports of race discrimination to CCMC management and Human Resources that he experienced and other Black employees also experienced such as Ms. Brenyah.  Despite the evidence of race discrimination, CCMC did nothing to correct the racial discrimination. The fact that CCMC denied receiving evidence to corroborate Ms. Brenyah's report of race discrimination when, in fact it did, supports that the investigation it conducted was not accurately and truthfully conducted and that the investigation was pretext for discrimination and retaliation against Ms. Brenyah.

17. Instead of conducting a proper investigation and taking prompt and appropriate

action to stop the discrimination, Mr. Goodwine and Mr. Sewell started a course of retaliation against Ms. Brenyah for her protected activity in reporting and opposing race discrimination. In fact, at the meeting on June 21, 2017, both Mr. Goodwine and Mr. Sewell advised Ms. Brenyah that the "cliques" were not going anywhere (Ms. Brenyah understood this to mean that the racial discrimination was not going to be addressed) and *she* should transfer to another department, even a higher acuity unit on another campus of the Medical Center.   Mr. Goodwine and Mr. Sewell also admitted during this conversation that Ms. Brenyah was a good nurse. Further, if Ms. Brenyah's nursing skills and work performance were not appropriate for a higher skill level unit, she would not be allowed to transfer. Therefore, it was clear that both Mr. Goodwine and Mr. Sewell believed that Ms. Brenyah's nursing skills were satisfactory and that she was eligible for transfer as of June 21, 2017.

18. Punishing the victim of discrimination by advising them to transfer and covering-up unlawful race discrimination instead of taking appropriate disciplinary steps against those discriminating against the subject of the unlawful discrimination, Ms. Brenyah, is discriminatory, retaliatory and unlawful. During the June 21, 2017 meeting, Ms. Brenyah declined a transfer as *she* was being punished for the unlawful discriminatory conduct of others and, if she were to transfer, it would only embolden the discrimination within the work place. As well, a transfer was discriminatory and retaliatory as it was to a less desirable option for Ms. Brenyah because Mr. Goodwine and Mr. Sewell wanted to transfer Ms. Brenyah to Corpus Christi Medical Center Doctor's Regional. Management knew that Ms.

10

Brenyah frequently walked to work and CCMC was located approximately a block from her home.  She would not be able to walk to Corpus Christi Medical Center Doctor's Regional as it was several miles from her home.  Further, the position to which Mr. Goodwine and Mr. Sewell suggested that Ms. Brenyah transfer was also out of the area of practice that Ms. Brenyah was working in order to develop important skills. The proposed transfer was materially adverse and retaliatory.

19. On June 29, 2017, 11 days after Ms. Brenyah's probationary period ended and 8 days after her meeting with Mr. Goodwine and Mr. Sewell regarding her good faith opposition to and complaint of race discrimination, Mr. Goodwine and Mr. Sewell made an untimely decision to extend Ms. Brenyah's initial appraisal and probationary period based upon a trumped-up allegation of poor performance. Ms. Brenyah's probationary period ended on June 18, 2017 - 3 days prior to her June 21, 2017 meeting with Mr. Goodwine and Mr. Sewell.  To date, Ms. Brenyah had not been provided with any corrective action that would place on her notice of alleged  "poor performance" which was the pretext for extending Ms. Brenyah's probationary period. Ms. Brenyah obtained a copy of her employment file to confirm this fact.  The only alleged performance issue of which she had been made aware was the false allegation of being in the cafeteria which was clearly not true. Other non-Black nurses were not similarly treated. For example, a Hispanic nurse, Oscar Martinez, who failed to render proper patient care to a suicidal patient by failing to provide the patient with a sitter, allowed the patient to get up and fall at the door and hit his head. Mr. Martinez' 90 day

probation was not extended. Ms. Brenyah's extension of her 3 month probationary period by Mr. Goodwine and Mr. Sewell was clearly discriminatory and retaliatory for her protected reports of race discrimination especially in light of the temporal proximity of the protected act and adverse action.

20.   CCMC made inaccurate statements about the extension of Ms. Brenyah's probationary period by changing the dates as part of an investigation. Specifically, the paperwork presented to Ms. Brenyah from CCMC stated that her hire date was 3/20/17 and that the 3MO Date was 6/20/2017.  CCMC presented inaccurate information to investigators that her probationary period was signed on September 29, 2017.  The accurate facts are that Ms. Brenyah's probationary period was extended by Mr. Goodwine and Mr. Sewell on June 29, 2017 -  just 8 days after Ms. Brenyah refused the retaliatory transfer.  CCMC speaks out of both sides of its mouth - one side saying on the documented form that the end of Ms. Brenyah's probationary period was June 20, 2017 and, out of the other side of its mouth to investigators, that the probationary period ended on September 29, 2017.   CCMC's mendacity supports race discrimination and retaliation.

21. On July 7, 2017, Ms. Brenyah had written to Mr. Sewell to confirm that she had received no disciplinary action during her 90 days probation other than the "coaching." Within a few hours of sending this email, Mr. Sewell wrote back to Ms. Brenyah to allege that Ms. Brenyah had a complaint from a patient who had been discharged on July 7, 2017.

22. Ms. Brenyah met with Mr. Sewell on July 10, 2017 about the alleged patient

complaint.  Ms. Brenyah told Mr. Sewell that Kevin, a Hispanic CNA, had unhooked her patient IV and had taken the patient to the bathroom. Kevin had given the patient a shaving blade.  The patient had a bleeding disorder. The patient cut herself with the shaving blade and was bleeding excessively. The patient did not "fire" Ms. Brenyah after she cut herself.  In fact, the patient recommended that Michelle Terrell Christie, a Black nurse, and Ms. Brenyah were both excellent nurses to management in an effort to give them "kudos." Instead of passing along the "kudos" to the Black nurses, CCMC made-up a pretextual "complaint" by the patient to discriminate against the Black nurses and to justify discriminatory and retaliatory discipline against Ms. Brenyah.

23. On a previous occasion, Kevin told Mr. Dike that Mr. Sewell told him to spy on the Black employees and report back to him. Kevin made racially charged statements that created a hostile work environment such as telling Mr. Dike that he did not want him standing next to him. This remark was uncalled for and was clearly racially motivated as medical personnel must, from time to time, stand next to each other to perform their work. Ms. Brenyah opposed and reported this racially discriminatory incident to management.

24. On August 10, 2017, Mr. Sewell formally wrote-up Ms. Brenyah based upon the trumped-up allegations of allegedly providing poor care to the patient in early July 2017. Specifically, in an August 10, 2017 write-up, Mr. Sewell falsely alleged that Ms. Brenyah committed an offense with regard to a patient on July 6, 2017 - a day that Ms. Brenyah did not work. Further, the write-up did not contain any specifics of what Ms. Brenyah did to

justify the write-up and to allow her to understand the allegation against her and to respond.

25. After Ms. Brenyah pointed out to Mr. Sewell and CMCC Human Resources that she did not work on July 6, 2017, the date of the alleged incident, CCMC changed the date of the alleged incident.  However, the date to which it was changed also was a date that Ms. Brenyah did not work and it was not the date that the patient allegedly cut herself making it impossible for her to commit the alleged actions. Again, mendacity and inconsistent positions supports that the action was pretext for discrimination and retaliation against Ms. Brenyah. Further, Kevin, the CNA who admitted that he was to spy on the Black employees and was the CNA at issue in the alleged July 6, 2017 issues, was negligent toward the patient by giving her a razor to shave as she was a bleeding risk and not properly monitoring her or reporting these issues to the nurse assigned to the patient. Further, a CNA is not allowed to unhook a patient IV and CCMC turned a blind eye to this fact in regard to Kevin. Kevin, a Hispanic employee was not disciplined - only Ms. Brenyah.  Also, Mr. Sewell never produced any actual patient complaint. Failure to have documentation also supports that the action was pretext for discrimination and retaliation.

26. Ms. Brenyah reported to CCMC upper management about the discriminatory and retaliatory false allegations brought forth by Mr. Sewell based upon the write-up of August 10, 2017 and requested relief.  Also, Ms. Brenyah opposed and reported discriminatory conduct to another Black African employee, Mr. Dike.  Ms. Brenyah reported to upper management that the charge nurses were using Mr. Dike's race to justify changing his

assignments to benefit non-Black and non-Black African employees. This was reported to Ms. Zamora, but she just made excuses and allowed Mr. Dike to be subjected to discrimination by patients without taking any appropriate action. This position was also condoned by Mr. Sewell.  Instead of CCMC investigating the reports of discrimination and retaliation raised by Ms. Brenyah, CCMC condoned and effected the discriminatory and retaliatory write-up of Ms. Brenyah and race discrimination within the hospital.

27. In late August 2017, Ms. Brenyah was involved in an automobile accident.  Ms. Brenyah reported the injury to her chain of command, including Mr. Sewell.  Ms. Brenyah was in excruciating back pain and had significant leg numbness - the kind of physical problems that inhibit an individual from being able to function safely resulting in the need for immediate and urgent medical care. Later, MRI results showed that Ms. Brenyah had suffered a herniated disc in automobile accident. Ms. Brenyah's insurance company assisted her with receiving the necessary urgent care that she needed in the form of medical care, physical therapy and medication and they advised her to go to an HCA facility for physical therapy and other care. Therefore, Ms. Brenyah went to Corpus Christi Medical Center Doctor's Regional (hereinafter "Doctor's Regional).

28. As instructed by the insurance company, Ms. Brenyah went to Doctor's Regional on August 25, 2017, just before Hurricane Harvey, to try to obtain appropriate health care for this urgent medical situation. Ms. Brenyah's friend, Nkem Hatter, who is also a Black African and registered nurse, but did not work for CCMC, accompanied Ms. Brenyah to

Doctor's Regional because it was not safe for Ms. Brenyah to be by herself because she was significantly adversely effected by the pain and injuries that she was experiencing. Ms. Brenyah was concerned that if she did not receive the urgent care she needed prior to the hurricane, she may not be able to receive the needed care for several weeks as the approaching hurricane was very powerful and Ms. Brenyah's medical condition required immediate care.  Ms. Brenyah and Ms. Hatter packed a few belongings to take to Doctor's Regional in case Ms. Brenyah was admitted to the hospital.

29. While at Doctor's Regional, Ms. Brenyah learned that she would not be able to receive physical therapy because of Hurricane Harvey.  Doctor's Regional effectively closed the hospital except for emergency services. Ms. Brenyah's pain was so bad that the medication that Ms. Brenyah had been given was not helping her and her physical condition was so impaired that her safety was implicated. Therefore, Ms. Brenyah sought treatment from the emergency room at Doctor's Regional.

30. On the way to the emergency room, Ms. Brenyah and Ms. Hatter sat briefly on the chairs at the hallway of the second-floor at Doctor's Regional (which is the floor where physical therapy is located) because Ms. Brenyah's pain and numbness was increasingly incapacitating. Shortly after sitting down, two supervisors, Annette Enrriques and Josefa Espinoza, both Hispanic, recognized Ms. Brenyah as an employee and called her name and approached her.  They began questioning Ms. Brenyah about why she was not working and that she was supposed to be either in the A or B Team. Ms. Brenyah told them that she was

currently on disability and medical leave and that she had come to seek therapy and medical treatment. Ms. Espinoza, a registered nurse, without any discussion or assessment, bluntly stated that Ms. Brenyah did not look like she was in pain or feeling numbness and that she should be working.  If she was not going to work, then they were going to kick her out into the hurricane.  Ms. Brenyah was clearly injured as she was wearing a back support brace. Without cause, Doctor's Regional officials called security and the police on Ms. Brenyah.

31. Ms. Brenyah begged the two supervisors to let her go to the emergency room for evaluation and treatment especially as she may not be able to get any medical care for several weeks after the hurricane. Ms. Espinoza volunteered to take Ms. Brenyah to the emergency room. On their way to the emergency room, security and a police officer approached Ms. Brenyah ordering her to leave the hospital. Ms. Espinoza denied knowing Ms. Brenyah and said that Ms. Brenyah didn't look like she was in pain. Ms. Brenyah was shocked and got into panic attack because immediately prior Ms.Espinoza volunteered to take her to the emergency room. Ms. Brenyah responded asking if she knew what was going on in her body. Ms. Espinoza relented and took Ms. Brenyah to the emergency room and then left. The personnel in the emergency room were reluctant to treat Ms. Brenyah because of the commotion and statements of Ms. Espinoza and the police being called.  Simply put, the emergency room employees did not believe that Ms. Brenyah, a fellow medical professional and employee, was actually involved in a car accident and injured - making the ordeal even more horrifying for Ms. Brenyah.

32. After Ms. Brenyah was discharged from the emergency room, what appeared to Ms.Brenyah to be two police men and David, the security guard, took Ms. Brenyah upstairs to get Ms. Brenyah's friend.  Ms. Brenyah asked David, the CCMC security guard, who told him to call the police on her and he responded that "the employees" told him to call the police on her if she would not leave. They told me to have you removed because you are not patient here and I told you that if you did not leave, I would call CCPD to have you removed. On the way upstairs, the police men and the security detained Ms. Brenyah and ordered her not to answer her phone calls from family and friends that were calling because they were worried about her because of the hurricane. Ms. Brenyah was afraid and panicked because, as a Black person, she was worried that she may be subject to unnecessary police actions and force - including even being shot.

33. Ms. Zamora, Ms. Brenyah's former unit manager whom Ms. Brenyah reported racial discrimination against, was working at Doctor's Regional on the day and time of the events involving the police and she actually rode the elevator with Ms. Brenyah, the two policeman and security guard. The appearance was that Ms. Zamora was part of the discrimination and retaliation against Ms. Brenyah on August 25, 2017.

34. A disinterested witness who was a patient in the emergency room approached Ms. Brenyah. This witness identified herself as Ms. Della Gacias (sp?) and she told Ms. Brenyah, "I noticed what they did. I saw that," in reference to calling the police and security on her when she was discharged from the emergency room.  Ms. Casillas told Ms. Brenyah, "That

is terrible. That is terrible. It really wasn't necessary."  Ms. Casillas also commented to the effect that she really didn't like that "white man's" behavior toward Ms. Brenyah. Ms. Brenyah knew that Ms. Casillas was referring to David, the security guard, as the "white man."  As Ms. Casillas and Ms. Brenyah spoke, a man interjected himself to let them know that everything they are saying is being audio and video recorded by the hospital including where they were standing.  Ms. Casillas agreed that everything should be recorded and stated that the entire event should be on video maintained by CCMC.   Despite this fact, the video recordings were neither produced to Ms. Brenyah, who asked for the videos in writing which included a spoilation request not to destroy this evidence, or to investigators. Ms. Brenyah made a formal complaint with CCMC alleging racial harassment and retaliation about this incident.  CCMC never responded.

35. After Ms. Brenyah was released to return to work from the injuries that she received from the automobile accident, including a herniated disc, CCMC refused to place Ms. Brenyah back on the schedule and locked her out of her employee accounts.  Ms. Brenyah made numerous attempts to be placed back on the schedule with both Rebekah Smith and Mr. Sewell which are documented by her phone records. Ms. Brenyah called and spoke with Ms. Smith on March 7, 2018 for 1 minute at 1:24 p.m. to speak to her about getting back on the schedule.  Ms. Brenyah completed computer re-orientation class on March 8, 2018. Ms. Brenyah expected that she would be placed back on the schedule.  After waiting patiently 5 days, Ms. Brenyah called Ms. Smith on March 13, 2018 at 10:13 a.m. and

left a message confirming that she completed the re-orientation and that she was waiting to be placed back on the schedule.  Efforts to get Ms. Brenyah back to work were initiated by Ms. Brenyah and they were not reciprocated by CCMC.  Ms. Brenyah's phone records show that her pleas to return to work fell upon deaf ears.  As CCMC refused to communicate with Ms. Brenyah and place her back on the work schedule, she was constructively terminated on March 21, 2018. After CCMC refused to place Ms. Brenyah back on the schedule and she was constructively discharged, CCMC attempted to collect a payment it made to entice Ms. Brenyah to come to work for them even though CCMC was the cause of Ms. Brenyah's employment separation.  CCMC threatened legal action against Ms. Brenyah to collect the funds causing her further distress.

36.  Not only was Ms. Brenyah subjected to racial harassment, a hostile work environment and discriminated and retaliated against, but also Ms. Brenyah's observation and knowledge of race discrimination toward other Black employees highly offended her and also adversely affected her working environment.

37. This lawsuit is timely as it is filed within 4 years of the actions made the basis of this lawsuit and this lawsuit is brought under 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991, which has a 4 year statute of limitations.

## CLAIMS

### Discrimination and Retaliation in Violation of
### 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991

38.  Ms. Brenyah  incorporates by reference the allegations contained in paragraphs

20

1 through 37.  Ms. Brenyah brings this claim under 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991, against CCMC for creating a hostile work environment, harassment, disparate treatment and discriminating against her based upon her race arising from her employment and termination of that employment and for retaliation for opposing and reporting race discrimination.  Ms. Brenyah is a member of an identifiable class of persons who was subjected to intentional discrimination solely because her race, ancestry and her ethnic characteristics are of the Black African people. Ms. Brenyah was discriminated against in regard to her rights under 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991, including the termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.  These rights are enforceable and actionable under 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991. Also, Ms. Brenyah was retaliated against because she reported and opposed unlawful race discrimination based upon these protected factors to CCMC which is a violation of 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991, for which Ms. Brenyah brings claims in this lawsuit.

39. As a result of the above alleged illegal acts, Ms. Brenyah seeks damages, past and future, for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, injury to reputation and other nonpecuniary losses.  As well, Ms. Brenyah also seeks damages, past and future, for loss of wages, benefits and other pecuniary losses as a result of Defendants' unlawful actions.  Ms. Brenyah seeks her damages, attorney's fees, equitable relief, expenses, costs and any other relief as allowed by law, including, but not

limited to under 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991, and 42 U.S.C. §1988.

## Jury Trial Requested

40. Plaintiff requests a trial by jury.

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant and award Plaintiff the following:

1. Actual damages plus interest including, but not limited to, wage loss and lost benefits, past and future, as allowed by law;

2. Compensatory damages arising from emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to reputation and other nonpecuniary losses, past and future, as allowed by law;

3. All damages and relief as allowed under 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991;

4. Punitive and/or exemplary damages as allowed by law;

5. Prejudgment interest as allowed by law;

6. Post-judgment interest as allowed by law;

7. Attorney's fees as allowed by law, including, but not limited to under  42 U.S.C. §1988(b);

8. Court costs, expert fees and expenses as allowed by law;

9. Equitable relief as appropriate and allowed by law, including, but not limited to

reinstatement or front pay if reinstatement is not granted;

      10. Such other legal or equitable relief ultimately justified by the proof of this case.

                    Respectfully Submitted,

                    By:    /s/ Gay E. Gilson
                    Gay E. Gilson
                    State Bar No. 00784131/Fed I.D. 16385
                    Law Offices of Gay E. Gilson
                    5525 S. Staples, Suite B3
                    Corpus Christi, Texas 78411
                    Tel: (361) 887-0552
                    Fax: (361) 887-0554
                    Email: gegilson@gilsonlaw.com
                    Attorney in Charge for Plaintiff