United States District Court
Southern District of Texas
**ENTERED**
October 07, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| BRENDA BRENYAH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 2:21-CV-00087 |
| | § | |
| COLUMBIA HOSPITAL CORPORATION | § | |
| OF BAY AREA, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM AND RECOMMENDATION</u>

Plaintiff Brenda Brenyah filed suit in May 2021 against Defendants Columbia Hospital Corporation of Bay Area ("Columbia") and Bay Area Healthcare Group ("Bay Area"). (D.E. 1). The operative complaint is Brenyah's May 2022 fourth amended complaint. (D.E. 71). In her complaint, Brenyah raises discrimination and retaliation claims under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Americans with Disabilities Act of 1990 ("ADA").[1] These claims arise from Brenyah's time working as a nurse for Corpus Christi Medical Center ("CCMC"), which is operated by Columbia and Bay Area. Now pending are: (1) CCMC's motion for summary judgment on all of Brenyah's claims (D.E. 104); (2) Brenyah's objections regarding various

---

[1] For the purposes of this memorandum, "ADA" is inclusive of the original Americans with Disabilities Act and the Americans with Disabilities Act Amendments Act of 2008.

evidentiary issues (D.E. 107); and (3) CCMC's motion to strike (D.E. 118), along with the responses and replies (D.E. 107, 116, 118, 122, 125, 131, 132, 133, 134).

For the reasons discussed further below, it is recommended that: (1) Brenyah's evidentiary objections be **OVERRULED** in part and **SUSTAINED** in part; (2) CCMC's motion for summary judgment (D.E. 104) be **GRANTED**; and (3) CCMC's motion to strike (D.E. 118) be **DENIED as moot**.

## I.    *ALLEGATIONS*

Brenyah alleges the following in her fourth amended complaint. (D.E. 71). She was born in Ghana and her race is Black-African. (*Id.* at 2, 5). Defendants Columbia and Bay Area are general partners and operate CCMC. (*See id.* at 3). CCMC has locations throughout the Corpus Christi area. (*Id.* at 3-4). For purposes of this memorandum, the two Defendants acted as a single enterprise, and both entities employed Brenyah. (*See id.* at 3, 5; D.E. 104 at 2) (noting Brenyah worked "for Defendants").

Brenyah became a registered nurse in January 2013. (*Id.* at 5). She was hired to work at CCMC's Bay Area hospital on March 20, 2017. (*Id.* at 6). Pursuant to a collective bargaining agreement ("CBA"), Brenyah was required to complete a 90-day probationary period after being hired. (*Id.*). Beginning on May 2, 2017, Brenyah was discriminated against based on her race and national origin, and she also witnessed discrimination against other black employees. (*Id.* at 7). After Brenyah reported this discrimination, CCMC retaliated against her. (*Id.*).

Supervisory charge nurse Monica Rivera discriminated against Brenyah in several ways, including: (1) telling her that her African food stunk; (2) telling her that she preferred Filipino nurses to black nurses; (3) stating that another black nurse named David Mike was no longer black because he married a Filipino; and (4) mocking Brenyah's African accent. (*Id.* at 8). These comments occurred on at least a weekly basis. Other black nurses, including Lawrence Dike and Michelle Cummings, were subjected to similar treatment. Another charge nurse, Angela Guerra, stated that she preferred Filipino nurses to black nurses because black people like to play the race card. (*Id.*). CCMC admitted as part of its investigation that Rivera had stated, as a joke, that a nurse who regularly went to the Phillipines was not black anymore. (*Id.* at 8-9). Dike's race was used as a reason to place him in more difficult assignments, and he was forced to endure the use of racial slurs by patients. (*Id.* at 9).

In May 2017, unit manager Marissa Zamora discriminated against Brenyah by accusing her of abandoning patients to go to the cafeteria. (*Id.*). Despite Brenyah presenting evidence that this accusation was false, including that the cafeteria was not open at the time she was working, Zamora issued her a coaching for the incident. (*Id.* at 10). CCMC also refused to check surveillance video, stating that it was only used for safety issues, not for employment matters. They told Dike the same when allegations were made against him. Nonetheless, CCMC later utilized the surveillance video to terminate Dike's employment. (*Id.*). Other non-black and non-African nurses abandoned patients by

sleeping during working hours with CCMC's knowledge, but CCMC took no action against these nurses. (*Id.* at 10-11).

Brenyah reported the incidents to Vince Goodwine, the Vice President of Human Resources, and Jason Sewell, the Director of Patient Care Services, in late May or early June 2017. (*Id.* at 12). Under the terms of the CBA, her 90-day probationary period should have ended on June 18, 2017. Brenyah met with Goodwine and Sewell on June 21, 2017, and was informed that no other employees verified her allegation that there was discrimination in the department. (*Id.*). Brenyah knew this was untrue because Cummings, Dike, and Mike had all reported discrimination. (*Id.* at 12-13). CCMC did nothing to correct the discrimination, and Goodwine and Sewell's denial of corroborating evidence indicated that their investigation was a pretext for discrimination and retaliation. (*Id.* at 13). Instead of addressing the discrimination, Goodwine and Sewell advised Brenyah that the "cliques" she reported were not going away, and she should transfer to a different department, even a higher acuity department on another campus. Both stated she was a good nurse. (*Id.*). Brenyah declined a transfer because she did not want to embolden discrimination, she preferred working at the Bay Area campus, and the proposed position was out of her area of practice. (*Id.* at 14).

On June 29, 2017, Goodwine and Sewell extended her probationary period, claiming poor performance. (*Id.*). Brenyah had received no corrective action that could have put her on notice of the alleged poor performance. (*Id.* at 15). Other non-black nurses were not treated similarly, including Oscar Martinez, who failed to render proper patient

care to a suicidal patient and allowed the patient to stand up, fall at the door, and hit his head.  Martinez's probationary period was not extended.  Further, Goodwine and Sewell told Brenyah at the meeting one week earlier that she was a good nurse and gave no indication of any performance issues.  The extension of the probationary period was materially adverse because Brenyah could not accrue seniority and could be disciplined or discharged in the sole discretion of the hospital.  (*Id.*).  CCMC later made inaccurate statements about when her probationary period ended.  (*Id.* at 16).

On July 7, 2017, Goodwine confirmed to Brenyah and Sewell that she had no disciplinary actions during her initial 90-day probation period.  (*Id.*).  Within hours, Sewell responded that a patient who had been discharged made a complaint about her.  (*Id.*).  Brenyah met with Sewell about the alleged complaint and explained that another non-black nurse named Kevin had taken her patient to the bathroom and given her a razor.  The patient had a bleeding disorder and cut herself while shaving, causing her to bleed profusely.  (*Id.*).  Contrary to what Sewell said, the patient stated that Brenyah and another black nurse were both excellent, but instead of passing along the patient's praise, CCMC made up a pretextual complaint to justify discriminatory and retaliatory action against Brenyah.  (*Id.* at 16-17).  Kevin had previously told Dike that Sewell asked him to spy on the black employees, and Kevin also previously made racially-charged statements, including telling Dike he did not want to stand next to him due to his culture and national orientation.  (*Id.* at 17).  On August 10, 2017, Sewell formally wrote up Brenyah for the incident, but the write up provided no details regarding the incident and indicated that it occurred on a day

Brenyah did not work. (*Id.*). When Brenyah pointed out the date discrepancy, CCMC changed the date, but Brenyah did not work that day either and it was not the date the patient allegedly cut herself. (*Id.* at 18). Following Goodwine's and Sewell's failure to address the discriminatory environment and retaliatory actions, Brenyah escalated her complaints to Stephanie Tice, Director of Corporate Ethics and Compliance, and Thomas Cook, a Case Manager, but there was no indication either person took any action. (*Id.* at 19).

Beginning in August 2017, CCMC discriminated against Brenyah on the basis of a disability by failing or refusing to treat her, failing to engage in the interactive process when she was released to light work, harassing her, interfering with her attempts to exercise her rights, and failing to reinstate her when she could return to full duty. (*Id.*). In August 2017, Brenyah was injured in a car accident and placed on disability and approved leave. (*Id.* at 19-20). Following the accident, Brenyah was in excruciating back pain and had significant leg numbness. (*Id.* at 20). Her employer-provided health insurance required that she receive physical therapy through a hospital affiliated with CCMC. (*Id.*). Brenyah's health insurance assisted her in trying to receive urgent medical care, and Sewell directed her to go to an affiliate facility for physical therapy. (*Id.* at 21). On August 25, 2017, Brenyah went to Doctors Regional, another CCMC campus, to obtain physical therapy. (*Id.* at 21-22). She arrived at the hospital shortly before the arrival of Hurricane Harvey because she was concerned that if she did not receive care then, she may have to wait several weeks. (*Id.* at 22). Her friend Nkem Hatter, a Black-African registered nurse

who did not work for CCMC, accompanied her to the hospital and helped carry her belongings. When she arrived at the hospital, Brenyah learned that she would not be able to receive physical therapy because the hospital was closed except for emergency services due to the approaching hurricane. Brenyah opted to seek treatment from the emergency room. (*Id.*).

While on the way to the emergency room, Brenyah and Hatter sat down briefly due to Brenyah's pain. (*Id.*). They were approached by two supervisors who recognized Brenyah as an employee. (*Id.*). They began to question Brenyah regarding why she was not working, and Brenyah explained that she was on disability and came to seek treatment. (*Id.* at 23). One of the supervisors, Josefa Espinoza, stated that it did not look like Brenyah was in pain or feeling numbness, and that if she could not work, they were going to kick her out of the building. They also threatened to call Goodwine and Sewell, and ultimately called security and the police on Brenyah. Brenyah requested to go to the emergency room, and Espinoza agreed to take her to the emergency room. On the way, a security guard and police officer approached and ordered Brenyah to leave the hospital. Espinoza denied knowing Brenyah and said she did not look like she was in pain. Brenyah questioned how Espinoza could know what was happening her body, and Espinoza continued to escort her to the emergency room. (*Id.*). As a result of the commotion, the emergency room staff was reluctant to treat Brenyah and did not believe that she was actually injured. (*Id.* at 23-24). Although Brenyah received care in the emergency room, it was inadequate. (*Id.* at

24).  Espinoza was familiar with Brenyah before this incident and was aware that Brenyah had alleged harassment in other situations.  (*Id.*).

After Brenyah was discharged from the emergency room, a security guard and two police officers took Brenyah upstairs to get Hatter.  (*Id.* at 25).  The security guard told Brenyah that CCMC employees had told him to call the police on her if she would not leave.  On the way upstairs, the security guard and police prevented Brenyah from answering her phone.  Their behavior caused Brenyah to fear that they may use force on her, including shooting her.  (*Id.*).  Zamora, Brenyah's former unit manager, appeared on the elevator during this time, so Brenyah assumed she was also involved in the discriminatory and retaliatory behavior.  (*Id.* at 25-26).  Another patient in the emergency room approached Brenyah and told her that she saw what was done to Brenyah and that it was not necessary.  (*Id.* at 26).  Brenyah made a formal complaint to CCMC, including making a report to Kathleen Rubano, the Chief Nursing Officer, but never received any response or follow-up.  (*Id.*).  Brenyah's union also brought the police incident up at a November 2017 grievance hearing, but CCMC's representatives refused to address the issue.  (*Id.* at 26-27).

CCMC's actions denied Brenyah meaningful medical care and constituted intentional harassment because of her disabilities.  (*Id.* at 27).  They also constituted discrimination on the basis of race and national origin, along with retaliation for her previous reports of discrimination.  (*Id.*).  Sewell indicated in an e-mail that he intended to

take disciplinary action against Brenyah as a result of the incident, which was also brought to the attention of CCMC's Chief Operating Officer, John McDonald. (*Id.* at 27-28).

On November 16, 2017, Michael Lamond, the Director of Labor Relations, confirmed in an e-mail that Brenyah's grievance relating to her written warning was denied. (*Id.* at 29). Lamond, Sewell, and Goodwine denied knowing anything about the incident at Doctors Regional, but Lamond's and Sewell's e-mails show they knew of the incident. (*Id.*). While Brenyah was released to light-duty work between November 25, 2017, and January 7, 2018, CCMC refused to engage in the interactive process and put her back on the schedule even though she could perform the essential functions of her job. Other non-black nurses were provided with light duty and alternative assignments. (*Id.* at 30).

After being released to full duty on January 8, 2018, Brenyah made several attempts to be placed back on the schedule and completed the necessary computer re-orientation course, but CCMC made no effort to put her back on the schedule. (*Id.* at 31-32). Brenyah submitted a letter of constructive discharge on March 21, 2018, because CCMC refused to communicate with her or place her back on the schedule and took discriminatory and retaliatory actions against her. (*Id.* at 32-33). These discriminatory and retaliatory actions continued even after Brenyah's employment ended when CCMC attempted to collect a signing bonus it paid Brenyah when she began working there. (*Id.* at 33). In addition to the direct discrimination and retaliation, Brenyah was highly offended by the

discrimination she witnessed against other black employees, which also affected her working environment.  (*Id.*).

On December 22, 2017, Brenyah filed an EEOC charge against CCMC, which she later amended on January 3, 2018, which alleged race, national origin, and disability discrimination and retaliation.  (*Id.* at 29).  On February 12, 2019, Brenyah filed a second EEOC charge alleging retaliation and disability discrimination.  (*Id.* at 33-34).

Brenyah raises three categories of claims.  First, she alleges discrimination and retaliation in violation of 42 U.S.C. § 1981 based on CCMC's creation of a hostile work environment, harassment, disparate treatment, and discrimination based on race.  (*Id.* at 35-36).  Brenyah bases this claim on her employment and termination from employment, in addition to her attempt to obtain medical services from Doctors Regional.  (*Id.* at 36). Second, Brenyah alleges discrimination and retaliation in violation of Title VII, 42 U.S.C. §§ 2000e-2, 2000e-3, based on CCMC's creation of a hostile work environment, harassment, disparate treatment, and discrimination based on race and national origin.  (*Id.* at 37-38).  Finally, Brenyah alleges discrimination in violation of Title I and Title V of the ADA, 42 U.S.C. §§ 12101 *et seq.*, based on CCMC's refusal to provide medical services, failure to engage in the interactive process to return her to work, failure to offer light duty work, harassment, creation of an abusive working environment, and failure to reinstate her when she was released to full duty.  (*Id.* at 39-41).  Among other remedies, Brenyah seeks damages for lost wages.  (*Id.* at 42-43).

## II.   EVIDENTIARY OBJECTIONS

### a.    Brenyah's Objections

#### i.    Spoliation

Brenyah first argues that CCMC should be precluded from summary judgment due to questions of spoliation.  (D.E. 107 at 2).  After review, it is recommended that Brenyah's spoliation objection be **OVERRULED**.  Moreover, it is recommended that her objection to CCMC's Exhibit PP (D.E. 116-1), which CCMC uses to support its argument against spoliation, be **OVERRULED**.

Beginning with the objection to Exhibit PP, which is a declaration by CCMC Security Manager Jerry Vesely, Brenyah claims that paragraphs 1, 4, 6, 7, 14, 15, 16, and 17 should be struck for lack of personal knowledge, paragraphs 5-7 should be struck as hearsay, and paragraphs 16 and 17 are disingenuous or otherwise inconsistent with other evidence.  (D.E. 122 at 4-5).[2]  As to personal knowledge, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  In the paragraphs that Brenyah objects to, Vesely discusses CCMC's lockdown policy at Doctors Regional, statements that Doctors Regional's lead security guard David LaVenture made to Vesely about the incident with Brenyah, and the use of security guards who are not CCMC employees.  (D.E.

---

[2] This memorandum addresses each of Brenyah's objections, but notably, CCMC relies only on paragraphs 3, 7-12, and 17 of Vesely's declaration in its briefing.  (D.E. 116 at 1 n.1 and 2 n.4).

116-1 at 2-4).  Although Vesely was not at Doctors Regional during the incident with Brenyah, he has personal knowledge of CCMC's lockdown policy, what he was told by LaVenture, and the use of non-employee security guards.  As to Brenyah's hearsay objection, hearsay is a statement offered to prove the truth of the matter asserted in that statement. Fed. R. Evid. 801(c)(2).  Vesely's discussion of what LaVenture told him is not being offered to prove the truth of what LaVenture said, but rather to explain Vesely's investigation of the incident.  Finally, Brenyah's assorted other objections go to the weight or credibility of Vesely's statements, not to their admissibility.  Accordingly, it is recommended that Brenyah's objections to Exhibit PP be overruled.

"Spoliation of evidence 'is the destruction or the significant and meaningful alteration of evidence.'"  *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) (quoting *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 612 (S.D. Tex. 2010)). Spoliation may be used as a factor in ruling on a summary judgment motion.  *See Coastal Bridge Co. v. Heatec, Inc.*, 833 F. App'x 565, 572 (5th Cir. 2020).  For a party to successfully allege spoliation, she must establish the following: (1) the spoliating party controlled the evidence in question and had an obligation to preserve the evidence at the time it was destroyed; (2) the spoliating party intentionally destroyed the evidence; and (3) the spoliating party destroyed the evidence in bad faith. *Id.*; *see also Guzman*, 804 F.3d at 713 (requiring bad faith or bad conduct for a successful spoliation claim).  In the spoliation context, bad faith "'generally means destruction for the purpose of hiding

adverse evidence.'" *Van Winkle v. Rogers*, 82 F.4th 370, 375 (5th Cir. 2023) (quoting *Guzman*, 804 F.3d at 713).

Here, Brenyah broadly alleges that "[f]acts are unavailable because Defendants (1) destroyed relevant video from August 25, 2017; (2) did not provide the discrimination investigation file and interview notes; (3) cannot identify a patient and security guard who witnessed events of August 25, 2017." (D.E. 107 at 2). Regarding the video, Brenyah fails to allege that CCMC acted in bad faith. Even considering Brenyah's argument that CCMC erred in allowing security footage to be destroyed—rather than intentionally destroying the evidence—the argument fails. (*See* D.E. 122 at 1-2). CCMC preserved, and provided to Brenyah, a large portion of the August 25, 2017, security video. (*See* D.E. 116 at 1; D.E. 116-1 at 2-4). The evidence indicates that all available footage was provided, and there was no indication that the footage not provided would contain adverse evidence as there were either no cameras where Brenyah was located, or Brenyah was not interacting with hospital staff. (*See* D.E. 116-1 at 3). Regarding the discrimination investigation file and interview notes, Brenyah does not provide evidence that CCMC destroyed this file or these notes—meaning she does not show spoliation. (*See* D.E. 107 at 2) (noting CCMC "did not provide" the file and notes); (D.E. 122 at 2) (noting only that Goodwine testified that he took notes, and there was an investigation file). Lastly, regarding CCMC's inability to identify the potential patient and security guard witnesses, it is unclear how that fits into Brenyah's spoliation argument as Brenyah did not allege or provide any evidence that

would imply CCMC's failure to identify these individuals was in bad faith.  As such, Brenyah's speculative spoliation claims fail.

>    ii.   *Exhibit KK (D.E. 105-3)*

Brenyah next objects to CCMC's Exhibit KK, (D.E. 105-3), arguing that it "is a hearsay statement by an unnamed patient who is not a party opponent [offered] to prove the truth of the matter asserted[,] and [Brenyah] could not examine the patient."  (D.E. 107 at 2).  Exhibit KK contains Sewell's report and witness statements from his investigation into the patient complaint that led to Brenyah's August 10, 2017, disciplinary action.  *See* (D.E. 104-42 at 4; D.E. 105-3).   After review, it is recommended that the Court **OVERRULE** Brenyah's objection. (D.E. 107 at 2).

Hearsay is a statement offered to prove the truth of the matter asserted in that statement.  Fed. R. Evid. 801(c)(2).  Exhibit KK is not hearsay as CCMC is not offering the exhibit to prove the truth of what the patient asserted, but rather is offering it to show what was said to Sewell—and thus why he initiated the disciplinary action.  *See id.*; (D.E. 104 at 7, 20–21).   Further, even assuming the exhibit contained hearsay, it would be admissible under the business record exception to the hearsay rule.  *See* Fed. R. Evid. 803(6); (D.E. 104-42 at 2, 4) (indicating record was kept and made as part of regularly conducted business activity by the record custodian); (D.E. 104-6 at 12; D.E. 105-3 at 6) (indicating record was made near time of the incident); *cf. Brauninger v. Motes*, 260 F. App'x 634, 636–37 (5th Cir. 2007) (finding that Rule 803(6) hearsay exception applied to

reports made by human resources managers documenting investigation and findings in sexual harassment investigation).

### iii.  Exhibit LL (D.E. 104-39)

Brenyah next objects to CCMC's Exhibit LL, arguing that it "is hearsay, contains legal conclusions, and not a Determination by the EEOC." (D.E. 107 at 2) (citing *Autry v. Fort Bend Indep. Sch. Dist.*, 704 F3d 344, 348 (5th Cir. 2013)). CCMC argues that Exhibit LL falls under the public record exception to the hearsay rule. (*See* D.E. 116 at 2). After review, it is recommended that the Court **OVERRULE** Brenyah's objection. (D.E. 107 at 2).

Federal Rule of Evidence 803(8) provides an exception to the hearsay rule, allowing courts to consider a public office's statement in a civil case if it contains "factual findings from a legally authorized investigation[,]" and the opponent of the evidence does not "show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A)(iii)-(B). Exhibit LL contains a letter from the EEOC, a public office, to Brenyah detailing its findings regarding Brenyah's EEOC complaints up to the date of the letter. (*See* D.E. 104-39 at 2–3). The exhibit also contains a notarized certificate attesting that the "attached pages are true and correct copies from" Brenyah's EEOC file that is signed by Norma Guzman, the EEOC's San Antonio Office's field director. (*Id.* at 4). Brenyah has not demonstrated, or argued, that the letter is untrustworthy. (*See* D.E. 107 at 2; D.E. 122 at 3). As such, it is recommended that the Court find that Exhibit LL is admissible as a public record. *See* Fed. R. Evid. 803(8)(A)(iii)-(B); *Brooks v. Firestone*

*Polymers, LLC*, 70 F. Supp. 3d 816, 827–28, 827 n.3 (E.D. Tex. 2014) (finding EEOC letter admissible at summary judgment stage pursuant to Rule 803(8)(A)(iii) and collecting cases), *aff'd*, 640 F. App'x 393 (5th Cir. 2016).

> iv.  *Exhibit MM (D.E. 104-40)*

Brenyah next objects to CCMC's Exhibit MM, claiming that the exhibit "is hearsay and expert testimony not timely designated."  (D.E. 107 at 2).  CCMC argues that the exhibit is admissible under Rule 803(8) and Rule 902, that it is not expert testimony, and that the Court may take judicial notice of the exhibit per Rule 201.  (D.E. 104 at 34 n. 15; D.E. 116 at 2-3).  After review, it is recommended that the Court **SUSTAIN in part** and **OVERRULE in part** Brenyah's objection.  (D.E. 107 at 2).

Exhibit MM contains two Texas Health and Human Services ("THHS") reports, respectively titled 2022 Hospital Nurse Staffing Study and Updated Nurse Supply and Demand Projections.  (D.E. 104-40 at 2-8).  The exhibit does not fall under Rule 803(8). *See* Fed. R. Evid. 803(8) (requiring that the public record set out the office's activities or contain factual findings from a legally authorized investigation).  The exhibit is also not expert testimony.

Under Rule 201, a court "must take judicial notice if a party requests it and the court is supplied with the necessary information."  Fed. R. Evid. 201(c)(2).  Courts may, however, only take judicial notice of adjudicative facts that are not subject to reasonable dispute because the facts are "generally known within the trial court's territorial jurisdiction" or the facts "can be accurately and readily determined from sources whose

accuracy cannot reasonably be questioned." Fed. R. Evid. 201(a)-(b).  CCMC uses Exhibit

MM as support for the following facts:

- "Texas, like many other states, is and has been experiencing a severe nursing shortage exacerbated by the COVID-19 pandemic." (D.E. 104 at 34; *see also* D.E. 116 at 2).
- "[T]he nursing shortage has been worsening since 2018." (D.E. 104 at 34) (citing D.E. 104-40 at 2-5).
- "[T]he registered nurse position vacancy rate increased from 5.9% in 2019 to 17.6% in 2022." *Id.* (citing D.E. 104-40 at 2).
- "For full-time RN positions, more than one out of six available positions were reported vacant." *Id.* (citing D.E. 104-40 at 2)).[3]

CCMC has supplied the Court with the necessary information to take judicial notice

of the above facts and THHS's accuracy cannot reasonably be questioned—nor has

Brenyah attempted to question it in this case.  *See* Fed. R. Evid. 102(b)(2).  As such, for

purposes of the instant motion, it is recommended that the Court take judicial notice of the

above facts pursuant to the THHS's 2022 Hospital Nurse Staffing Study.  *See* Fed. R. Evid.

102(a)-(c); (D.E. 104-40 at 2-5).  Because CCMC does not rely on THHS's Updated Nurse

Supply and Demand Projections, it is recommended that this report be **EXCLUDED**.  (*See*

D.E. 104-40 at 6-8).  It is likewise recommended that the Court not consider THHS's 2022

Hospital Nurse Staffing Study except as support for its judicial notice of the above facts.

(*See id.* at 2-5).

---

[3] The specific statistic reported by THHS states that "[o]f 84,817 [full-time registered nurse] positions reported statewide, 14,910 were vacant." (D.E. 104-40 at 2).

b.    **CCMC's Motion to Strike (D.E. 118)**

As discussed further below, the undersigned recommends that CCMC's motion for summary judgment be granted with or without consideration of the exhibits CCMC objects to.  Accordingly, it is recommended that CCMC's motion to strike be denied as moot.

### III.  *SUMMARY JUDGMENT EVIDENCE*

a.    **Documents and Correspondence**

Under CCMC policy, if any employee believes that they have experienced any job-related harassment based on race, national origin, or disability, they should report it to their supervisor or human resources, who will investigate and take appropriate action.  (D.E. 104-2 at 3; D.E. 104-4 at 4-5).

Under the CBA, both CCMC and the union agree to not discriminate on the basis of race, national origin, or disability.  (D.E. 104-7 at 10).  Any alleged discrimination was subject to the grievance procedure defined in the CBA.  (*Id.*).  Probationary nurses did not accrue seniority, although those who completed the probationary period and became a regular nurse would be awarded seniority retroactively to their initial hire date.  (*Id.* at 22).  Any written discipline by CCMC would be subject to the grievance process.  (*Id.* at 26).  However, informal coaching discussions, reprimands, or counseling were not subject to the grievance procedure, would not be considered part of the nurse's formal personnel file for disciplinary purposes, and could not form the basis to increase the level of discipline imposed if the nurse repeated the conduct.  (*Id.* at 26-27).  The first 90 days of a nurse's employment was a probationary period.  (*Id.* at 27).  Such an employee could be disciplined

or discharged in the sole discretion of the hospital, with or without just cause. If a probationary nurse's performance was unsatisfactory, CCMC could extend the probationary period an additional 90 days solely upon written notice to the nurse and union. That decision was not subject to the grievance process. (*Id.*). The CBA provided for a grievance procedure beginning with an attempted informal resolution, followed by the filing of a formal grievance with the Department Head, and finally the filing of an appeal to CCMC's Chief Nursing Officer or Chief Operating Officer. (*Id.* at 28-29).

The position description for a registered nurse, which Brenyah signed on March 15, 2017, before beginning her job, set minimum physical requirements for the job, including the ability to: (1) stand for 6 hours per day; (2) sit for 1 hour per day; (3) walk for 6 hours per day; (4) exert up to 100 pounds of force occasionally, 50 pounds frequently, and 20 pounds constantly; (5) occasionally bend, balance, pull with force, reach above the head and shoulder, twist at the waist, lift from floor level up, and lift above shoulders and head; and (6) frequently squat, kneel, push or pull up to 50 pounds, lift or carry up to 50 pounds, and lift from waist level up. (D.E. 104-23 at 2, 12).

CCMC's hurricane plan indicated that, at the start of hurricane season, department directors should designate all employees as either Team A or Team B staff. (D.E. 104-29 at 3). Team A was to include only those necessary to perform essential duties during a hurricane condition. (*Id.*). When a hurricane warning was issued, CCMC would announce the beginning of emergency operations, which would include, among other things: (1) securing or boarding up all entrances to the building with the exception of the

emergency room; (2) allowing only hospital employees with appropriate identification who were required to work into the building; and (3) clearing all visitors and non-staff from the building.  (*Id.* at 5).

A May 3, 2017, audit showed that the majority of the staff only missed one or two reassessments of pain medication, except for Brenyah, who missed seven occurrences. (D.E. 105-1 at 15-20).  Zamora discussed the process and expectations with Brenyah, who indicated understanding.  (*Id.* at 20).  A May 2017 follow-up showed improvement.  (*Id.*).

On May 16, 2017, Zamora met with Brenyah to discuss time management issues, noting that Brenyah had repeatedly stayed over 45 minutes after the end of her shift to catch up on documentation.  (D.E. 104-18 at 2).  Zamora provided Brenyah with a routine shift workflow example and also discussed another issue.  (*Id.* at 2-3).

On May 19, 2017, Dike emailed Sewell regarding various discriminatory acts he had suffered during his employment at CCMC.  (D.E. 142-11 at 2-4).  In particular, Dike alleged that: (1) a coworker told him to stay at least 12 feet away because of his culture and orientation; (2) a nurse asked him to help clean a female patient, but the patient made him leave due to his gender, and Dike was written up for this; (3) a charge nurse became angry at him when he finished helping another nurse with a request before starting on the charge nurse's request, and Dike was written up for this; (4) Filipino nurses spoke their language around him and found fault with everything he did, including making false accusations against him; and (5) he was written up for going to the bathroom, but his charge nurse routinely left the hospital for more than an hour to get food.  (*Id.* at 3-4).  On May

28, 2017, Dike sent another email to Sewell because a nurse yelled at him and accused him of not answering his phone, but he had already done what she requested and never received any phone calls. (D.E. 142-14 at 2). Dike attempted to have the issue resolved by a charge nurse, but her and the nurse began speaking their language and the charge nurse then reported Dike to his manager. (*Id.*).

On May 20, 2017, Brenyah admitted a patient and placed a heart monitor on him, but failed to inform the monitor tech. (D.E. 105-1 at 2). As a result, the patient went most of the night and day shift without any heart monitoring. (*Id.* at 3). The patient also went a whole shift without an IV. Brenyah told the day shift nurse that she had not tried to start an IV because the patient's "veins [were] too crooked." (*Id.*). The day shift nurse had no issues inserting the IV. (*Id.* at 4).

On May 20, 2017, Brenyah emailed Sewell regarding several concerns she had regarding both patient care and unequal treatment of nurses. (D.E. 104-8 at 2). Brenyah alleged concerns about patients falling after bed alarms were turned off for convenience, narcotics discrepancies left unaddressed for days, charge nurses Guerra and Rivera abandoning patients to get food, other nurses changing her patients' infusion pumps, and black nurses being treated differently than others. Brenyah stated that she was falsely accused of going downstairs without telling anyone, when in fact it was Guerra who left the hospital to get food and who ignored another nurse sleeping at the nurse's station. In another instance, Rivera called Brenyah after she had already left work and made her return to complete her documentation, even though other nurses also failed to complete their

documentation.  Brenyah stated that lying about black nurses and setting them up was part of the unit's culture.  (*Id.*).  On May 31, 2017, after meeting with Sewell, Brenyah sent a follow-up email largely reiterating her concerns from the previous email in greater detail. (D.E. 104-9 at 2-4).  Brenyah stated that Rivera regularly stated her preference for Filipino nurses instead of black nurses because Filipino nurses do not report racism.  (*Id.* at 3).  Rivera also recently told Mike that because he married a Filipino, he was no longer black. She also called African foods smelly.  (*Id.*).

On May 23, 2017, Zamora met with Brenyah regarding orders that were not followed through on during her shift despite Brenyah's acknowledgment of them.  (D.E. 105-1 at 6).  These orders needed to be completed by 8:00am because the patient was scheduled for surgery at noon.  Brenyah stated that the patient was refusing everything, so she did not complete the order.  A charge nurse took over and got everything complete just in time for surgery.  Zamora gave Brenyah an action plan stating that she must follow through on all orders, ask questions about any she did not understand, and notify the charge nurse if a patient was refusing.  Records indicate that Brenyah did notify the charge nurse at the time.  (D.E. 142-39 at 2).  Zamora also brought up a required dressing change that Brenyah had not noticed or completed on one of her patients and provided Brenyah with a copy of the relevant policy.  (D.E. 105-1 at 6).

On June 8, 2017, Zamora wrote a narrative for Brenyah's personnel file regarding a discussion she had with Brenyah regarding a competency fair for the nurses.  (D.E. 104-18 at 4-6).  Brenyah was not aware of the competency fair and stated that, because she was

new, Zamora should have personally told her about it. (*Id.* at 4). Zamora responded that there had been a flyer in the nurse's lounge for almost a month and that she had sent an email to all staff. (*Id.*). Zamora also noted that the other night shift nurses left work by 7:30 to 7:45 a.m., whereas Brenyah stated that she did not arrive until 9:30 a.m., indicating that she had still been at work until 9:15 a.m. (*Id.* at 5). Brenyah stated that she left at 8:00 a.m., but went home to eat breakfast before coming to the competency fair. Zamora told her that was a time management issue and that Brenyah needed to go home and sleep. Brenyah demanded to be taken off the schedule for that night because she would not get enough sleep, which Zamora did. (*Id.*). Zamora noted that this narrative was a follow-up to Brenyah's action plan regarding time management. (*Id.* at 6). Zamora stated that she had seen no improvement and that Brenyah was still regularly clocking out long after her shift ended. (*Id.*). Brenyah's time records indicate that, based on the credited hours worked, she extended her shift by at least an hour 44 of the 54 times she worked full 12-hour night shifts. (D.E. 104-19 at 2-5).[4]

On June 20, 2017, Rivera emailed Zamora and Sewell regarding a conversation she had with Brenyah the previous day. (D.E. 105-1 at 14). Brenyah told Rivera that she could not find the stickers for her new admission. Rivera asked if Brenyah knew how to print them out, and she said no. Rivera said she would show her, but Brenyah stated that she

---

[4] Brenyah has also provided additional time records for nurses Erica Casas and Oscar Martinez. (D.E. 107 at 8; D.E. 142-24 at 2-4). The records show that Casas extended her shift by at least an hour 8 times out of 25 shifts. (D.E. 142-24 at 2). Martinez extended his shift by at least an hour 3 times in 43 shifts. (*Id.* at 3-4).

was too busy to learn and would do so at another time. Rivera had previously showed Brenyah how to print patient labels. The admission was at 2:00am and Brenyah still had not printed them at 6:00am even though she only had four total patients and had passed only 5-6 medications that night. Brenyah spent a couple of hours at the computer in the doctor's area. Rivera asked Brenyah why she had not asked about the labels then, but Brenyah ignored her. Rivera found this disrespectful and a poor use of Brenyah's time. (*Id.*).

On June 21, 2017, CCMC completed an investigation summary regarding Dike's and Brenyah's claims of discrimination. (D.E. 104-12 at 2-3). As part of the investigation, CCMC interviewed Dike, Brenyah, Zamora, Mike, Cummings, and Rivera. (*Id.* at 2). CCMC investigated eight allegations. First, CCMC's investigation could not verify employees leaving work for extended breaks at unauthorized times. Second, the investigation could not verify that charge nurses were leaving for extended breaks. Third, the investigation did verify that the "lunch buddy" system was not being used on the night shift. Fourth, the investigation could not verify alleged race-based comments by Rivera. Fifth, the investigation could not verify that black employees avoided Zamora because she did not listen to them. (*Id.*). Sixth, the investigation could not verify different performance expectations for black employees compared to other employees. (*Id.* at 2-3). Seventh, the investigation did verify that a non-black nurse asked Dike for 12 feet of distance between them. (*Id.* at 2). Zamora had already addressed this. The employee stated that the request was due to a prior investigation into a patient complaint against Dike. (*Id.*). Finally, the

investigation did verify that another employee had spoken to Dike in a rude manner, but also that Dike had spoken in a rude manner to other employees. (*Id.* at 2-3). In addition to these findings on Dike's and Brenyah's specific allegations, the investigation also found that: (1) Zamora could have handled a patient care situation reported by Brenyah better; (2) Dike created problems due to abrasiveness with human resources months before his employment began; and (3) Rivera had a history of very short employment with previous companies. (*Id.* at 3). As a result of the investigation, CCMC: (1) offered lateral transfers to Dike and Brenyah, but both declined; (2) required the Department Director and Manager to check-in on operations during the night shift; (3) worked to ensure the lunch buddy system was used on the night shift; (4) researched internal options for diversity and inclusion training; and (5) counseled Zamora on how to have better handled the patient care situation Brenyah reported. (*Id.*).

On June 22, 2017, Sewell emailed Goodwine, noting that Brenyah's 90-day evaluation period was almost over and that she had some performance issues and had an action plan. (D.E. 142-21 at 3). Sewell asked if they would be able to terminate her or, alternatively, extend her probationary period. (*Id.*). Goodwine responded that any decision to terminate her or issue corrective action could be viewed as retaliation for her filing a formal complaint, and therefore: (1) any corrective measure had to be clearly and consistently documented; and (2) any similarly situated team members had to subject to the same corrective measures. (*Id.* at 2). Goodwine stated that the 90-day evaluation period was part of their normal operating process and that, pursuant to CCMC policy and the

CBA, they should extend her probationary period given the performance issues. Sewell stated that he believed Brenyah was setting the hospital up for an EEOC charge. (*Id.*).

On June 29, 2017, CCMC completed Brenyah's initial 90-day probationary appraisal. (D.E. 104-17 at 2). In the appraisal, CCMC concluded that Brenyah had completed her departmental orientation, had completed her initial competencies, and had satisfactory attendance. However, CCMC stated that her performance of job duties was not satisfactory and recommended extending the appraisal period. The appraisal specifically noted that Brenyah had difficulty keeping up with the demands of the unit, had severe time management issues, coached action plans were not effective, and Brenyah needed considerable direction with skills even after teaching. (*Id.*). Brenyah indicated disagreement with the appraisal and stated that many of the supposed issues had never been discussed with her before. (*Id.* at 2-3).

On July 4, 2017, Brenyah sent an email to Goodwine and Sewell regarding the investigation findings. (D.E. 104-11 at 3-5). She asserted that CCMC had ignored most of the issues she reported, particularly taking issue with nurses leaving campus on their breaks and CCMC's unwillingness to look at security camera footage during the investigation. (*Id.* at 3-4). She also reiterated that her, Dike, and Cummings all believed that Zamora failed to take their complaints seriously. (*Id.* at 4). Mike was the only black nurse that Brenyah had not heard talk about Zamora. Brenyah also believed that CCMC pushed aside Rivera's race-based comments as something to deal with sometime in the future. Brenyah alleged that the offer to transfer was retaliatory and would not solve either

the discrimination or patient-care issues in the unit. (*Id.*). Brenyah also alleged that, in a meeting about her 90-day probationary period, Sewell uncovered several new complaints and problems with her work that had never been mentioned previously. (*Id.* at 4-5).

On July 7, 2017, Goodwine responded to Brenyah's email, stating that it mischaracterized several aspects of the investigation. (*Id.* at 2). Goodwine's summary of the investigation was largely consistent with the June 21 summary. He further stated that, while the investigation found no evidence of Rivera's inappropriate comments, that allegation remained under review. Moreover, Goodwine stated that CCMC spoke to every black employee on the unit during the investigation, and there was no support for the allegation that they believed they were not heard by Zamora and refused to talk to her. Further, the investigation showed that Zamora was fairly handling coachings and disciplinary issues regardless of their race, gender, or ethnic background. (*Id.*). On July 31, 2017, Brenyah responded and disagreed with his characterization of her allegations and the thoroughness of CCMC's investigation. (D.E. 142-27 at 2-3). She also alleged that his email, like the investigation, did not address the patient safety issues she brought up. (*Id.* at 3).

On July 6, 2017, Sewell received a report that a patient had complained about the care she received from Brenyah and another nurse, Michelle Tyrel-Christie. (D.E. 105-3 at 2-3). Sewell emailed the employee the patient made the complaint to and asked her to describe what the patient told her so that he would have documentation. (*Id.* at 3). This employee responded that the patient told her that her care had gone downhill since she was

moved to the 3W unit, particularly with Brenyah and Tyrel-Christie. (*Id.* at 2). The patient stated that the first time those two cared for her, they were great and she gave them kudos during rounds, but after that, it seemed like they thought they no longer needed to give her good care and could focus on other patients instead. She mentioned this the next time a leader came for rounds, and this was apparently relayed to Brenyah and Tyrel-Christie, because one of them later commented that they liked her and did not know why she said they were not helping her. The patient felt they had been against her from that point. One night, the patient's IV was loose and dripping. She called a nurse, either Brenyah or Tyrel-Christie, to tighten it, but no one came. The patient fell asleep, and later awoke covered in IV fluid. She was upset and called for help, and when the nurses came, they asked why she had not called for help earlier. The patient did not like that question because she had called for help earlier, but then fell asleep. (*Id.*).

The employee further explained that the patient stated that the nurses got her up to shower, and she decided to shave her legs. (*Id.*). While shaving, she accidentally cut herself, and was bleeding on both legs when she returned to bed. She called for assistance, and the nurse who came to check on her asked why she was shaving her legs. The patient did not like the insinuation that she was being intentionally difficult or should not have shaved her legs. The patient went to sleep, but awoke later covered in blood from her knees down. She called for the nurses, but they were unhappy with her. The patient was crying because she thought she was bleeding to death, and Tyrel-Christie asked her if she always cried like that. The employee noted that she did not have better details on which nurse

cared for the patient on which night. The patient indicated she did not want Brenyah or Tyrel-Christie to care for her again, but found Tyrel-Christie particularly rude. (*Id.*).

Sewell followed up with the patient on July 6, 2017, and was told the following. (*Id.* at 4). She was brought to her room on Friday night, and Brenyah was her nurse. Brenyah was very nice and attentive. The next morning, Tyrel-Christie was her nurse, and everything was good until a "leader" came in to ask how things were going. The patient told the leader that Brenyah and Tyrel-Christie were doing a good job, and Tyrel-Christie was in the room at the time. For the rest of the day, the patient felt like Tyrel-Christie was less attentive. When the patient saw that Brenyah was her nurse after the shift change, she felt like her care would be better, but it was not. The patient told Brenyah that her IV was hurting and leaking, and Brenyah stated that she would be there in a minute. However, the patient fell asleep, and when she woke up a couple hours later, she was covered in IV fluid. She called for Brenyah, who "reprimanded" her for not calling earlier, but the patient had called earlier. A nursing assistant came to her room and brought her things for a shower. While in the shower, the patient was shaving and accidentally nicked her leg, causing it to bleed. She called for Brenyah, who was frustrated and upset with her. Brenyah asked where she got a razor and who gave her permission to shave. Brenyah made the patient feel like she had done something wrong and was being an inconvenience. The patient requested that neither Tyrel-Christie nor Brenyah care for her again. (*Id.*).

Nursing notes from Brenyah and Tyrel-Christie indicated that the shaving incident happened on the night of July 1, 2017. (D.E. 142-25 at 2). In her notes, Brenyah stated

that the patient was not compliant and pulled out her IV. The nursing assistant assisted the patient to the shower. The patient later called to complain about bleeding and stated that she cut herself while shaving. Brenyah put pressure on the bleeding, but it would not stop. Pressure dressing was placed on the wound, but the patient called again several times during Brenyah's shift because she was bleeding. Brenyah informed both the doctor, house supervisor, and charge nurse. Tyrel-Christie continued treatment the next morning. (*Id.*).

On July 10, 2017, Sewell met with Brenyah to discuss what the patient told him. (*Id.* at 5). Brenyah stated that she was not aware of an issue with the patient's IV and the patient had not complained about the IV before the shower. When the patient called her into the room, Brenyah found her in the bathroom bleeding from her leg. Brenyah stated that the nursing assistant must have removed the patient's IV and taken her to the shower without telling Brenyah. Brenyah held pressure on the leg to stop bleeding and called to notify a physician. The patient was non-compliant all night and kept getting up to go to the bathroom herself despite instructions to call for help. At some point, the patient did need a new IV, but Brenyah was unsuccessful in starting one and handed it off to the day shift. (*Id.*).

Sewell also met with the nursing assistant, who stated that during his midnight vital signs check, the patient complained that her arm was hurting. (*Id.*). He noticed that the patient's armband was tight around the same arm that was hurting. He went to the desk to tell Brenyah that the patient's arm was hurting and swollen. Brenyah stated that she was going to finish eating and then would go check on the patient. The nursing assistant printed

and placed a new armband on the patient and assured her that Brenyah would be in soon. Around an hour and a half later, the nursing assistant answered the call bell of the patient, who was crying and wet. Her IV was on the floor and leaking. He turned off the pump and wiped up the floor. The patient told him that Brenyah never came in to check on her. The patient requested to take a shower, so the nursing assistant gathered supplies and assisted her to the shower. His next interaction with the patient was when he was asked to bring gauze to help with the bleeding. (*Id.*).

Sewell spoke with Tyrel-Christie regarding the patient's concern about responsiveness and gave her coaching regarding what to do if she became busy with an admission and needed help managing her patients. (*Id.* at 6).

On July 31, 2017, Sewell completed an annual performance evaluation for Brenyah, concluding that she was "able to perform all skills needed for job requirement." (D.E. 142-28 at 10). Sewell noted that Brenyah needed to work on: (1) creating a harmonious work environment; (2) mastering new work routines, methods, and techniques; (3) her motivation in performing duties; (4) attending departmental meetings; and (5) time management. (*Id.* at 4-8). In summary, Sewell did not note any strengths, but noted that Brenyah needed to develop her skills of creating a harmonious work environment, time management, and consistent application of core measures and processes. (*Id.* at 11).

On August 10, 2017, Sewell issued Brenyah a written disciplinary action, noting issues with patient documentation and time management during her initial 90-day probationary period. (D.E. 104-20 at 2). The action noted that despite coaching sessions

and an action plan, the problems continued and resulted in an extension of the probationary period.  Further, the action stated that, on July 6, 2017, Brenyah "demonstrated a lack of care, an inability to prioritize, or effectively care for a patient."  (*Id.*).  Brenyah disputed the disciplinary action, particularly the part regarding an incident involving her patient care.  (*Id.* at 2-3).

On August 18, 2017, Sewell, Lamond, and McDonald exchanged emails regarding the union's plan to file a grievance regarding the previous week's disciplinary action.  (D.E. 104-14 at 2-3).  They also discussed Brenyah's discrimination allegations and noted that they would also be subject to the grievance process under the CBA.  (*Id.*).  Brenyah and her union representative filed a grievance that day disagreeing with the disciplinary action given to Brenyah on August 10, 2017.  (D.E. 104-15 at 2).  In an October 25, 2017, text, Lamond asked Sewell whether Tyrel-Christie had been disciplined following the patient complaint.  (D.E. 140-85 at 2).  Sewell responded that he only talked to Tyrel-Christie because the patient's complaint was that she was not very responsive, and it was the first time he had heard complaints about her and it was for only a small part of her shift.  He stated that Brenyah's was for her whole shift and also about how she talked to the patient. Lamond responded that "[t]he union knows Brenda is nuts."  (*Id.*).

On August 23, 2017, Brenyah texted Sewell to inform him that she was in a car accident and that her doctor referred her to immediate physical therapy, light duty, and the day off.  (D.E. 104-21 at 2).  Sewell responded that they did not have light duty and noted that it did not sound like Brenyah would be able to work for a little while, so he marked

her as ill for her upcoming shifts on the 23rd, 25th, 26th, and 27th.  (*Id.* at 3).  Brenyah's medical records from the same day indicated that it was medically necessary that Brenyah be excused from work and then limited to light-duty work with no heavy lifting above 10 pounds, no prolonged standing, and no prolonged walking until cleared by a physical therapist.  (D.E. 105-2 at 3).  A later record indicated that Brenyah's doctor stated that she was limited to no heavy lifting over 5 pounds, no physical strenuous activity or movement, and no walking up or down stairs.  (D.E. 104-26 at 2-3).  The doctor indicated that Brenyah should remain out of work until November 25, 2017, and then return to work with the listed restrictions between November 26, 2017, and January 7, 2018.  (*Id.* at 3).

A security report completed by LaVenture and dated August 25, 2017, indicated that Brenyah caused a disturbance at Doctors Regional and was escorted off the property by the police.  (D.E. 104-28 at 3).  Espinoza called LaVenture and asked him to meet her on the second floor.  She told them that there was a CCMC employee at the hospital who was on a leave of absence and needed to leave the hospital because she was not working.  LaVenture and security guard Daniel Lopez spoke to Brenyah and explained to her that only working employees and patients were allowed at the hospital due to a lockdown, but Brenyah became upset and argumentative.  Brenyah checked herself into the emergency room, but after being discharged, she refused to leave the hospital.  The police arrived due to someone calling them about her, but it was not security who called them.  During the incident, Brenyah was causing a disturbance around patients and accused them of being racist.  LaVenture attempted to explain the lockdown procedure, but Brenyah continued to

argue and threatened to file a lawsuit.  One officer went with Lopez to escort Hatter off the property, and Brenyah was also escorted off the property by police.  (*Id.*).  Lopez's security report was consistent with LaVenture's.  (D.E. 140-46 at 8).

Joy Conda, the Vice President of Quality Management at Doctors Regional, stated in a September 7, 2017, email to Sewell that her, Espinoza, and Annette Enrriques were rounding the hospital to ensure that everyone there was either a patient, a family member of a patient, or an employee.  (*Id.* at 10).  Family members were checked for armbands. They found Brenyah, who they did not know was an employee at the time, and Hatter on the second floor and inquired what they were there for.  Brenyah told them that she was in a car accident, was on leave, and was sent there by her doctor.  They informed Brenyah that the area was closed and asked who she was there to see.  Brenyah kept repeating that her doctor was sending orders, and they kept telling her that there was no one to receive any orders.  Enrriques told Brenyah that she needed to go to the emergency room to be checked.  Conda saw Lopez and told him they needed help escorting someone to the emergency room.  At some point, Brenyah asked why they only asked her and not all the other people in the waiting room, but they were checking everyone and had already checked a family on the other side of the room, who all had wristbands.  Conda, Lopez, and Espinoza all started to go to the emergency room, but Brenyah stated that was harassment.  Espinoza privately told Conda that she was familiar with Brenyah, who had used the word "harassment" in other situations.  Conda parted with Espinoza and Lopez. (*Id.*).  Enrriques's recounting was largely consistent, although she stated that Espinoza told

her and Conda that Brenyah was an employee as they approached her.  (*Id.* at 13).
Espinoza's recounting was also largely consistent, although she stated that her, Conda, and
another employee excused themselves to attend a command center meeting before
Espinoza and Conda returned to Brenyah.  (*Id.* at 15).

Brenyah's emergency room records indicate that she was diagnosed with anxiety
and with back pain due to a motor vehicle accident.  (D.E. 142-33 at 14-17).  She was
prescribed Xanax for her anxiety and it was noted that she already had Tramadol for her
back pain.  (*Id.* at 17).  She was also provided instructions regarding how to care for her
back pain and how to manage her anxiety.  (*Id.* at 27-30).  An MRI conducted on September
13, 2017, showed that Brenyah had a 3.5mm disc protrusion.  (D.E. 142-34 at 2).

On September 9, 2017, Dike emailed Sewell and reported that, after he informed
Guerra of a patient safety issue, she reported him to the house supervisor and they
reassigned him without addressing the safety issue.  (D.E. 140-15 at 12).  Dike also reported
that a nurse was sleeping on his shift, but Guerra would not wake him up.  (*Id.*).  Dike
continued to report nurses sleeping on their shift, including providing pictures, to Sewell,
Goodwine, and others through March 24, 2018.  (*Id.* at 2-11).  On May 28, 2018, Sewell
spoke with and issued disciplinary actions against several nurses over the allegation that
they were sleeping during their shift.  (D.E. 142-6 at 2-11).

Lamond informed the union that Brenyah's final grievance was denied on
November 16, 2017.  (D.E. 104-16 at 2).  On December 5, 2017, Brenyah emailed her
union representative and stated that she was not surprised that the hospital denied her

grievance.  (D.E. 142-37 at 2).  She further stated that she did not believe there had been any patient complaint and that Sewell had fabricated it to write her up.  (*Id.* at 2-3).

On December 22, 2017, Brenyah filed her initial charge of discrimination with the EEOC.  (D.E. 140-92 at 4-5).

On January 5, 2018, Brenyah texted Sewell, stating that she tried to call Rebekah Smith to inform her that she could return to work, but was told Smith was sick and out of the office.  (D.E. 104-30 at 2).  Human resources told Brenyah to contact Sewell regarding her return.  (*Id.* at 3).  Sewell responded that he was also out sick that day, but asked when Brenyah would be released to work.  (*Id.*).  Brenyah stated that she wanted to be back on the schedule for January 15, 2018, but wanted to do an orientation and refresher class since she had been out of work for so long.  (*Id.* at 4).  Sewell responded that he would contact her the next week to discuss return options.  (*Id.*).

On January 9, 2018, Sewell texted Brenyah and asked if she had an updated CPR certification.  (D.E. 104-32 at 2).  Brenyah responded the next day that she did, and Sewell asked her to upload it to the human resources system.  (*Id.* at 2-3).  He also noted that Brenyah had some education assignments to complete prior to being scheduled and asked Brenyah to let him know when they were done.  (*Id.* at 3).  Brenyah then stated that she had not completed the assignments because she was on sick leave, but if she had to do them, she would be clocking in at the hospital computer lab to do so.  (*Id.* at 4).  Sewell stated that she could do them at home or come into the hospital computer lab, but she would

be paid for the time regardless. (*Id.* at 5). He stated that Brenyah would have to coordinate with human resources to use the hospital lab. (*Id.*).

On January 17, 2018, Sewell again texted Brenyah to see if she had completed the assignments so they could add her back to the schedule. (D.E. 104-33 at 2). Brenyah responded that she was having difficulty accessing them, but was getting help from IT. (*Id.* at 3). Sewell responded with directions to sign in to the assignments, and Brenyah said they were the same directions she had received previously, but they did not work. (*Id.* at 3-4).

On February 7, 2018, Brenyah texted Sewell and stated that she asked for a new badge because her old badge was defective, but that human resources told her that Sewell had to put in a request for a new badge. (D.E. 140-93 at 8). Sewell confirmed, said he would make a request, and did so the next day. (*Id.*). On February 12, 2018, Brenyah texted Sewell and stated that she went to Doctors Regional to pick up her badge, but was told it was at Bay Area. (D.E. 104-34 at 2). Sewell stated that he had the badge and Brenyah could come pick it up. He asked if she had completed the assignments. Brenyah stated that she would pick up her badge that day and that she had two assignments remaining because she was still having issues opening them. (*Id.* at 2-3). On February 16, 2018, Brenyah informed Sewell that she picked up her badge, but it was not activated, so she could not check in at the hospital to complete the assignments there. (*Id.* at 3). Sewell stated that was "weird" and provided a phone number for the person who printed the badge. (*Id.*).

On February 19, 2018, Brenyah told Sewell that she called the number and left a message, but never received a response. (D.E. 104-35 at 2). Sewell told her to try human resources at Doctors Regional and noted he would be out the next three days. On February 26th, Brenyah informed Sewell that she had completed the past due assignments and further was interested in a training because she had been out so long. (*Id.* at 3). The next training was March 7, 2018. Sewell asked if she wanted to do that training before returning, and Brenyah stated that she needed it. (*Id.*). Sewell told Brenyah to let him know when she completed the class so they could put her back on the schedule. (*Id.* at 4). On March 13, 2018, Smith texted Sewell and told him that she had spoken to Brenyah, who had inquired about having two weeks of orientation when she returned because she had been out for six months. (D.E. 104-37 at 2). On March 22, 2018, Sewell texted Brenyah and told her that they needed her back on the schedule and that Smith would call her that day to coordinate. Brenyah responded that she contacted Smith weeks ago to coordinate her return, but Smith never responded. (D.E. 104-35 at 4). Brenyah's phone records showed that she called Smith on March 7 and March 13, 2018. (D.E. 142-38 at 19).

In a letter to Sewell dated March 21, 2018, Brenyah stated that she had been forced to resign from her position due to the previously reported discrimination, harassment, and retaliation, along with the incident at Doctors Regional. (D.E. 104-36 at 2-3). Brenyah also stated that she had communicated with Smith about returning, but that Smith never got back to her. (*Id.* at 3).

In a September 10, 2019, letter to Brenyah, an investigator for the EEOC stated that she had reviewed the evidence and would be moving forward with a recommendation to dismiss the case. (D.E. 104-39 at 2). Among other things, the EEOC investigator concluded that the incident at Doctors Regional was a non-work-related incident that was outside the scope of the investigation. (*Id.*).

In an undated text, Tyrel-Christie stated that if CCMC wanted to give Brenyah light duty, they would have, and that an unidentified pregnant nurse was given charge nurse duty until she gave birth. (D.E. 140-114 at 2).

**b. Video and Audio[5]**

In a June 20, 2017, audio recording of a meeting between Dike, Sewell, and Goodwine regarding CCMC's investigation into Dike's allegations, Sewell tells Dike that, if a patient asks to have someone care for them who is not black, and an employee who is not black is available, then CCMC will honor such a request. (Ex. 24 at 1:06:58-1:07:22).

The August 25, 2017, security camera footage from Doctors Regional, which does not include sound, shows the following. (D.E. 149).[6] Brenyah first appears on video at 1:29:15pm near a second floor elevator. (DR1 at 1:29:15). She then enters an elevator to go to the first floor. (*Id.* at 1:29:53). She then exits on the first floor, where LaVenture is waiting for her and, after speaking with an employee, he follows Brenyah down a hallway.

---

[5] The video and audio files were submitted on discs and will be referred to by the exhibit number on the disc and, where necessary, the time stamp unless otherwise stated.

[6] The DVD exhibit includes 15 specific surveillance videos. This memorandum will refer to the files as "DR1" through "DR15" and cite specific time stamps for each video.

(DR2 at 1:30:15-1:30:30). Brenyah continues down a hallway, accompanied by LaVenture and another employee, who she stops to speak with before continuing down another hallway. (DR3 at 1:30:40-1:31:33; DR4 at 1:30:57-1:31:48; DR5 at 1:32:01-1:32:40).

Brenyah, LaVenture, and another security guard then arrive in the emergency room to check-in. (DR6 at 1:32:40-1:38:30). A sign in the emergency room states that "Corpus Christi Medical Center is not a shelter. Accepting patients with medical emergency only." (*Id.*). Brenyah then goes to speak to someone behind a desk who is not visible on the camera. (*Id.* at 1:40:24-1:42:58). During this conversation, a police officer enters the emergency room and speaks to Brenyah. (*Id.* at 1:43:04-1:43:45). Brenyah then returns to checking in while continuing to converse with the police officer, security, and hospital staff. (*Id.* at 1:43:48-1:45:34). The police officer steps away to the side of the room during this conversation and the security guard and a member of the emergency room staff join him. (*Id.* at 1:45:34-1:46:55). The group then leaves the room while Brenyah continues to check in. (*Id.* at 1:46:56-1:48:46). The security guard re-enters the room. (*Id.* at 1:48:21). Brenyah then enters an examination room. (*Id.* at 1:48:51). Several minutes later, Brenyah exits the examination room and then checks out at the front desk. (DR7 at 2:00:37-2:07:04). Throughout this period, police officers and security guards enter and exit the room. (*Id.*).

After checking out, Brenyah begins to exit the emergency room, but stops to speak to a police officer. (*Id.* at 2:07:10-2:07:51). She then goes to speak with LaVenture off

screen while two police officers and another security guard wait. (*Id.* at 2:08:06-2:09:32).[7]
She then leaves the emergency room accompanied by two police officers and three security
guards. (*Id.* at 2:09:38-2:09:54). Brenyah then returns to the second floor, accompanied
by police officers and security, to collect her belongings and her friend. (*See generally*
DR10, DR11, DR12, DR13). Brenyah then exits the hospital after being escorted by the
police officers and security. (*See generally* DR14, DR15). The videos end at 2:17:39pm.
(DR15 at 2:17:39).

In an audio recording from the August 25, 2017, incident that appears to be from
when Brenyah first arrived on the first floor to go to the emergency room, LaVenture tells
her that he has been instructed to call the police if she will not leave the hospital. (Ex. 69
at 0:06-0:17). Brenyah responds that she is going to the emergency room to be checked in
as a patient. (*Id.* at 0:17-0:29). Brenyah states that she is being harassed. (*Id.* at 0:52-
0:53). Another voice says that they are going to check Brenyah in. (*Id.* at 0:53-0:54).
While checking in, Brenyah again says they were harassing her and already knew her name
before approaching her, but an employee assures her they will take care of her. (*Id.* at 1:57-
2:15). The rest of the recording contains the remainder of Brenyah's check-in and her
medical appointment with the emergency room personnel. (*Id.* at 2:16-10:29).

In a second audio recording of the incident,[8] LaVenture tells Brenyah that he was
told to call the police on her if she refused to leave, but Brenyah went to check in at the

---

[7] This conversation can be seen in its entirety in DR8.
 [8] This is the conversation that is visible on camera in DR8. (*See* D.E. 140-78 at
8[28]).

emergency room and LaVenture did not call the police.  (Ex. 71; *see also* D.E. 140-76).

Brenyah also submitted an audio recording from the incident in which she is purportedly

speaking with another patient named Della Garcias, who states that Brenyah was unfairly

treated.  (Ex. 75; *see also* D.E. 140-76).

In a phone call from March 13, 2018, Brenyah asks Smith if her employee badge

registered when she went to complete a computer class at Doctors Regional.  (Ex. 92; *see*

*also* D.E. 140-95).  Smith responds that the system registered Brenyah's badge, and also

states that she will find out whether Brenyah can get a full-floor orientation given that she

had been out so long.  (Ex.94; *see also* D.E. 140-97).

### c.   Deposition Testimony[9]

Brenyah testified to the following.  (D.E. 140-6, 140-7, 140-8).  During the August

25, 2017, incident at Doctors Regional, two women approached her on the second floor.

(D.E. 140-7 at 23).  One was Enrriques, but Brenyah did not remember who the other one

was.  She did not think it was Espinoza because the video showed her meeting Espinoza

on the first floor.  (*Id.*).  She had a few interactions with Espinoza at Bay Area before

August 25, 2017, because Espinoza was the house supervisor at Bay Area.  (*Id.* at 27-28).

One woman referred to Brenyah by name and asked if she was working.  (*Id.* at 32).

Brenyah responded that she was not working and that she was there to seek treatment

following a car accident.  (*Id.* at 32-33).  Brenyah tried to explain that she had sought

---

[9] Several of the depositions are presented as four mini-pages on each full-size page. This memorandum cites to the full page with the specific mini-page in brackets.

treatment elsewhere the day before, but her insurance required her to seek treatment at a CCMC-affiliated hospital, and her pain and numbness were getting worse. (*Id.* at 33). The woman asked if Brenyah was sure that she was on disability, and Brenyah said she was on disability and Sewell or Goodwine could confirm that. (*Id.* at 33-34). Brenyah went to the hospital hoping she could be seen by someone, either for physical therapy or to get treatment or testing to evaluate her numbness. (*Id.* at 36). She went to the second floor because someone told her physical therapy was there. (*Id.*). The woman told her that physical therapy was closed and that, unless the emergency department admitted her for in-patient physical therapy, she would have to leave. (*Id.* at 49-50). Brenyah indicated that she was in severe pain and asked whether the emergency department could do something, and the woman agreed she could go to the emergency department. (*Id.* at 50).

Brenyah further testified that when she got to the first floor, Espinoza and LaVenture caught up to her and started asking questions. (*Id.* at 52). LaVenture started telling her that she had to leave or he would call the police. (*Id.*). Brenyah asked why they were harassing her. (*Id.* at 55). She never refused to leave. (*Id.* at 57). Brenyah had pain medication from her previous doctor, but it was not working, and she wanted something stronger. (*Id.* at 60-61). They did prescribe Xanax for her anxiety, but the pharmacy was closed. (*Id.* at 61).

Brenyah further testified that she worked 12-hour shifts on the night shift. (*Id.* at 95). While working, Brenyah heard various discriminatory comments, including: (1) that her African food smelled bad; (2) that Mike was no longer black because he married a

Filipino; (3) that Filipino nurses were preferred to black nurses because black nurses played the race card; (4) Dike being told to keep 12 feet of distance from another nursing assistant; (5) Dike having his assignments changed when patients did not want a black nursing assistant; and (6) being asked to repeat comments because of her accent. (*Id.* at 98-99, 101). The comment about the food smelling bad happened once or twice a week from various other employees. (*Id.* at 104-05). Rivera made comments about Mike not being black or preferring Filipino nurses once or twice a week on shifts Brenyah shared with her. (*Id.* at 111). She heard the nursing assistant tell Dike to keep 12-feet of distance around 6 times. (*Id.* at 115). She never heard a patient say they did not want Dike treating them because of his race, but she heard other people tell Dike that patients had said that. (*Id.* at 119). This happened around three times a month. (*Id.* at 120). Coworkers would ask her to repeat herself because of her accent around twice a week. (*Id.* at 128).

Brenyah further testified that she believed she was given a heavy patient load in retaliation. (140-8 at 2). Sewell extended her probationary period around a week after the initial 90-day period expired. (*Id.* at 9). Brenyah often stayed late because she had to complete her documentation. (*Id.* at 14).[10] Zamora did coach her on time management, but said she was coaching everyone on it. (*Id.* at 15). Brenyah denied that Zamora ever coached her on anything else. (*Id.* at 16). Regarding the July 2017 disciplinary action, Brenyah did not believe the patient had complained about her because that patient

---

[10] In a subsequent declaration, Brenyah stated that she was given higher acuity patients than other nurses and therefore had to spend more time at work. (D.E. 140-2 at 4). She also stated that she was never told she had severe time management issues. (*Id.*).

continued to tell her she did a good job after the alleged incident.  (*Id.* at 18).  Smith never refused to put her back on the schedule, but she said she would get a notification when Brenyah finished her classes and then put her on the schedule.  (*Id.* at 72-73).  However, Smith never followed up with Brenyah.  (*Id.* at 73).  Smith later said she would put Brenyah on the schedule, but did not.  (*Id.* at 75).

Dike testified to the following.  (D.E. 140-4).  The first discriminatory act he experienced was in August 2016 when his patient assignments were switched when patients stated they did not want a black nursing assistant.  (*Id.* at 7[22]).  He reported this to Zamora, who told him to "kill them with a smile" and offered no other help.  (*Id.* at 7[22-23]).  When he and Brenyah made food, Guerra and Rivera, and others, would close the door and say their African food smelled bad.  (*Id.* at 8[27-28]).  This happened once or twice a week.  (*Id.* at 9[30]).  Rivera also said she preferred Filipinos to black people because black people play the race card.  (*Id.* at 10[34]).  She also said that Mike was no longer black because he married a Filipino.  (*Id.*).  Brenyah was sometimes around when Rivera said these things.  (*Id.* at 10[35]).  He reported these things to Zamora as well, but she again told him to kill them with a smile.  (*Id.* at 11[37-38]).  Another nursing assistant asked Dike to give him 12 feet of distance due to Dike's skin color, culture, and orientation.  (*Id.* at 11[39]).  He said this more than once.  (*Id.* at 11[40]).  Dike reported this to Zamora, who made the other nursing assistant apologize, but he continued to make the comments.  (*Id.* at 12[42]).  Dike reported it again, but Zamora never did anything else.  (*Id.* at 12[43]).

Dike was often written up for being rude or aggressive to patients or other employees, but he was never rude or aggressive. (*Id.* at 15[53-54]).

Sewell testified to the following. (D.E. 140-17). Coaching was not part of the disciplinary process, but if an employee did not improve following a coaching, then discipline may begin. (*Id.* at 2[9]). Their investigation of Brenyah's and Dike's allegations of discrimination found that Rivera made a comment that Mike was no longer black because he married a Filipino, but that Mike was not offended by the comment. (*Id.* at 11[38]). They nonetheless told Rivera that, even though her and Mike could say those things to each other, it should not be said around everyone else. (*Id.* at 11[38-39]). Rivera also admitted to making comments about food stinking, but said it was not related to race or type of food, but rather any stinky food that could bother patients. (*Id.* at 11[40]). Sewell told her to watch her comments. (*Id.*). One of Dike's patients requested to be treated by someone who was not black, and CCMC accommodated that request both to protect Dike from such behavior and to make the patient comfortable. (*Id.* at 12[43]). This did not happen frequently. (*Id.* at 13[45]). Sewell issued a written disciplinary action to Brenyah after discussing an incident with a patient who told him that Brenyah was rude. (*Id.* at 17[63]). The patient also had concerns about Tyrel-Christie, which were addressed, but mostly about Brenyah. (*Id.*). The write-up had nothing to do with the quality of medical care Brenyah provided, but rather with how she made the patient feel. (*Id.* at 18[66]). The incident happened on July 2nd or 3rd, although the disciplinary action said the 6th. (*Id.* at

18[67]).  He had extended the probationary period of several employees over the years, but did not have exact details about the other examples.  (*Id.* at 28[107]).

Sewell further testified that the performance issues that led to the extension of Brenyah's probationary period were primarily around time management issues and documentation, but also processes with telemetry.  (*Id.* at 29[111]).  Brenyah had no discipline at the time, only coachings.  (*Id.*).  Although Schmidt's July 6, 2017, e-mail recounting the patient incident with Tyrel-Christie and Brenyah stated that it was Tyrel-Christie who was rude, Schmidt was not sure which nurse was involved with what, and based on his own interview of the witness and the hours each nurse worked, Sewell determined that it was Brenyah.  (*Id.* at 47-49[182-89]).  A unit secretary was not the same position as a floor nurse.  (*Id.* at 55[216]).  Brenyah was not qualified to be a charge nurse because she was too recent of a hire and did not know all of the processes well enough.  (*Id.* at 56[217]).  Charge nurses also had to perform all the same essential functions as floor nurses.  (*Id.* at 56[217-18]).

Goodwine testified to the following.  (D.E. 140-29).  He was CCMC's vice president of human resources.  (*Id.* at 3[7]).  His job duties included leading the investigation if an employee reported discrimination or retaliation.  (*Id.* at 3[8]).  As of July 7, 2017, Brenyah had received no discipline.  (*Id.* at 13[45]).  Sewell did not specifically discuss extending Brenyah's probationary period until two days after the initial 90-day period ended.  (*Id.* at 15[53-54]).  Goodwine acknowledged that he was at Doctors Regional on August 25, 2017, and is visible on the final surveillance video in which Brenyah is being escorted out by

police, but stated that he was not aware there was an incident until afterwards.  (*Id.* at 17[62-64]).  Goodwine took notes during the investigation of Dike's and Brenyah's complaints, but did not know where the investigation file was.  (*Id.* at 20[75]).  CCMC did not provide light-duty work to accommodate non-work injuries.  (*Id.* at 24[90]).  Goodwine's investigation found that Rivera did make a joke in which she told Mike he was no longer black because he went to the Philippines all the time.  (*Id.* at 25[94]).

Hatter testified to the following.  (D.E. 140-56).  Brenyah was in a lot of pain after her car accident.  (*Id.* at 6[20]).  She wanted to go the hospital for treatment and asked Hatter to accompany her.  (*Id.* at 7[21]).  When they arrived, they did not know where to go, so they decided to go upstairs and set their things down.  Within 10 minutes of their arrival, a couple of women passed by, and Brenyah told her they were supervisors.  (*Id.*).  Within a couple of minutes, they returned and asked Brenyah what she was doing there.  (*Id.* at 7[22]).  Brenyah told them that she was in a car accident and needed treatment.  (*Id.* at 7[22-23]).  The woman told her she needed to go to the emergency room.  (*Id.* at 7[23]).  Brenyah agreed and told Hatter to stay upstairs with their things.  (*Id.*).  Hatter did not hear from her again, but eventually looked out the window and saw a police car arrive.  (*Id.*).  Eventually, Brenyah returned along with two police officers and a security guard.  (*Id.* at 7[24]).  Hatter felt like they were being picked on because the police officers and security guards did not approach anyone else.  (*Id.* at 8[25]).  They left the hospital escorted by the officers.  (*Id.* at 8[26]).  Hatter did not see Brenyah do anything that warranted calling security and she did not refuse to leave the hospital.  (*Id.* at 18[65-66]).  During the initial

discussion with the staff members on the second floor, no one told them the area they were in was closed.  (*Id.* at 32[122]).  One of them said they would escort Brenyah to the emergency room, but Hatter did not see if the person got in the elevator with Brenyah.  (*Id.* at 32[123]).  The police officers did not speak to them other than telling them to get their things and hurry up.  (*Id.* at 33[126-28]).

LaVenture testified to the following.  (D.E. 140-78).  During the August 25, 2017, incident at Doctors Regional, Espinoza asked him to come see what was going on with Brenyah.  (*Id.* at 3[7]).  She did not ask him to call the police and he did not know who called the police.  (*Id.*).  When he met up with Brenyah and Espinoza on the first floor, Espinoza told him to go with Brenyah to make sure she got checked in at the emergency room.  (*Id.* at 5[13]).  During the incident, Brenyah was being very loud and causing a disturbance for staff members.  (*Id.* at 6[18]).  LaVenture disagreed with the portion of Lopez's report that said they initially met Brenyah on the second floor.  (*Id.* at 9[30]).

Conda testified to the following.  (D.E. 140-72).  She did not know Brenyah prior to August 25, 2017.  (*Id.* at 4[9]).  She knew of Espinoza, but did not have a relationship with her.  (*Id.*).  Enrriques was Conda's employee.  (*Id.* at 4[11]).  On August 25, Conda was assisting with emergency management responsibilities due to the approaching hurricane.  (*Id.* at 5[13]).  Her and Enrriques were walking the hallways and making sure everyone who was at the hospital needed to be there.  (*Id.* at 6[19]).  They encountered Brenyah, who did not have an armband on, and asked if she needed help and what she was there for.  (*Id.* at 6[20]).  Brenyah stated that she was waiting to see a doctor, but the area

she was in was closed, so they asked more questions to try to help her. (*Id.* at 7[22]). Brenyah said she was in a car accident and was on leave, which was the first time Conda learned she was an employee. (*Id.* at 7[22]). They told her they could assist her to go to the emergency department. (*Id.* at 7[23]). Conda thought Espinoza was also with her and Enrriques. (*Id.*). She believed there was a security guard nearby that she asked to help escort Brenyah to the emergency room, but there was no particular reason why. (*Id.* at 8[26-28]). After reviewing the video, Conda acknowledged that it appeared that Brenyah took the elevator to the first floor by herself. (*Id.* at 11-12[40-41]). She did not remember Espinoza doing or saying anything that made Conda feel like she was picking on Brenyah. (*Id.* at 16-17[60-61]). Conda never saw Brenyah be aggressive. (*Id.* at 25[95]).

Smith testified to the following. (D.E. 104-31). In March 2018, Smith had recently started as the nurse manager of Brenyah's unit. (*Id.* at 3[5-6]). This put her above the charge nurse in the chain of command, but below the director and house supervisor. (*Id.* at 3[6]). Sewell was the director. (*Id.* at 3[8]). In March 2018, Smith was not aware of Brenyah's race or national origin and did not know that Brenyah had reported discrimination. (*Id.* at 4[13]). Smith believed that she called Brenyah about returning to work because that would be her normal process, but she did not specifically remember calling Brenyah. (*Id.* at 5[17]).

## IV.  DISCUSSION

### a.    Summary Judgment Standard

"Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Terral River Serv., Inc. v. SCF Marine Inc.*, 20 F.4th 1015, 1017–18 (5th Cir. 2021) (quoting Fed. R. Civ. P. 56(a)). The moving party bears the initial burden of identifying the portions of the record it believes shows the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this requirement, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that" a genuine issue of material fact exists. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citing *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)). The nonmoving party "must identify specific evidence in the record and articulate how that evidence supports that party's claim." *Brush v. Wells Fargo Bank, N.A.*, 911 F. Supp. 2d 445, 457 (S.D. Tex. 2012) (Rosenthal, C.J.) (citing *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007)). A court is not required to search the record for evidence supporting a party's opposition to summary judgment. *Stults v. Conoco, Inc.*, 76 F.3d 651, 657 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)).

"A fact is 'material' if its resolution in favor of" a party could affect the lawsuit's outcome. *Hamilton*, 232 F.3d at 477. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Id.* The showing of a genuine issue is not satisfied by conclusory allegations, unsubstantiated assertions, or only a

scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Factual controversies are resolved in favor of the nonmoving party; however, there must be an actual controversy—both parties must have submitted evidence of contradictory facts. *Id.* Without proof, a court will not "assume that the nonmoving party could or would prove the necessary facts." *Id.* (emphasis omitted). If the record does not allow for "a rational trier of fact to find for the non-moving party, there is no genuine issue for trial[,]" and summary judgment must be granted. *See Brush*, 911 F. Supp. 2d at 457 (internal quotations omitted).

**b.    Race and National Origin Discrimination Under § 1981 and Title VII**

In its motion for summary judgment, CCMC first contends that Brenyah cannot meet her burden to prove a prima facie case of race or national origin discrimination under either § 1981 or Title VII because she cannot show she was subjected to an adverse employment action.  (D.E. 104 at 16).  CCMC argues that Brenyah voluntarily resigned her position and accordingly cannot show that CCMC took any action at all.  (*Id.*).  Further, CCMC asserts that the extension of Brenyah's probationary period, the August 2017 disciplinary action, and the offer to transfer do not qualify as adverse employment actions. (*Id.* at 16-18).  As for Brenyah's claim that she was constructively discharged, CCMC argues that Brenyah was not demoted, did not have her salary or job responsibilities reduced, was not reassigned, and did not receive inquiries about whether she was quitting. (*Id.* at 19).  CCMC contends that something more than mere allegations of race or national origin discrimination is required to support a constructive discharge claim.  CCMC argues

that the communication between Sewell and Brenyah demonstrated that they actively wanted her to return to work. (*Id.*). Finally, CCMC argues that, even if Brenyah could show that the extension of her probationary period was an adverse employment action, she cannot show that CCMC's legitimate reasons for the extension were merely pretext for discrimination. (*Id.* at 20). Specifically, CCMC asserts that the evidence shows that the extension was due to Brenyah's time management issues. (*Id.*). Similarly, CCMC contends that Brenyah cannot show that the reasons for the August 2017 disciplinary actions were merely pretextual. (*Id.* at 20-21).

Brenyah responds that she suffered several adverse employment actions, including when CCMC: (1) extended her probationary period; (2) denied her light duty work; (3) refused to return her to work; (4) denied her medical care; (5) had security and police follow and escort her from Doctors Regional; and (6) constructively discharged her. (D.E. 107 at 16-19). Regarding constructive discharge, Brenyah contends that CCMC never meaningfully addressed the discrimination, harassment, and retaliation, and upon her return, offered her employment on less favorable terms. (*Id.* at 19). Moreover, Brenyah contends that several facts support that CCMC's legitimate, non-discriminatory reasons were merely pretextual, including a lack of discipline for the alleged time management issues and disparate treatment in comparison to non-black nurses, and the fact that she was the only person escorted out of Doctors Regional for security reasons despite numerous other people in the hospital without the necessary wristbands. (*Id.* at 19-23). Finally,

Brenyah argues that CCMC did not address her § 1981 claim based on her status as a patient when she was denied medical services at Doctors Regional. (*Id.* at 35).

CCMC replies that Brenyah has not shown any adverse employment action, reiterating the arguments in its initial motion. (D.E. 116 at 3-7). CCMC similarly reiterates that Brenyah cannot show pretext. (*Id.* at 7). Further, CCMC contends that even under the Fifth Circuit's recent decision in *Hamilton v. Dallas Cnty.*, 79 F.4th 494 (5th Cir. 2023), which changed the standard of what qualifies as an adverse employment action, Brenyah has not shown that she suffered an adverse employment action. (D.E. 131 at 1-5). Finally, as to Brenyah's § 1981 claim, CCMC argues that there are no facts showing discriminatory animus on the part of Doctors Regional employees. (*Id.* at 5).

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under § 1981, each person is given the same right to make and enforce contracts and to the full and equal benefit of all laws as is enjoyed by white citizens. 42 U.S.C. § 1981. The standard for evaluating employment discrimination claims under both laws is the same. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999).

"A plaintiff can prove a claim of intentional discrimination by either direct or circumstantial evidence." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). When a person or persons with decision making authority evinces racial animus

that may constitute direct evidence of discrimination. *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 993 (5th Cir. 2005). "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Russell*, 235 F.3d at 222. Under this burden-shifting framework, the plaintiff must first prove a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. To do this, the plaintiff must show that she: (1) belongs to a protected class; (2) was qualified for her position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class, or that other similarly situated persons were treated better. *Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005). If the plaintiff successfully shows a prima facie case of discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for" the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802; *Septimus*, 399 F.3d at 609. If the employer presents a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that this reason was merely a pretext for discrimination. *Septimus*, 399 F.3d at 609.

In *Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir. 2023), and *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), both the Fifth Circuit and Supreme Court recently addressed what a plaintiff must show to establish an adverse employment action. First, in *Hamilton*, the Fifth Circuit abandoned its previous precedent limiting adverse employment actions to

only "ultimate employment decisions." *Hamilton*, 79 F.4th at 501-02.  Instead, the court concluded that a plaintiff need only show that she was "discriminated against, because of a protected characteristic, with respect to … the 'terms, conditions, or privileges of employment'—just as the statute says." *Id.* at 506.  The statutory phrase "terms, conditions, or privileges of employment" is broad and not limited to only economic or tangible discrimination. *Id.* at 503.  While Title VII still "does not permit liability for de minimis workplace trifles," the Fifth Circuit did not define "the precise level of minimum workplace harm" necessary to support a discrimination claim. *Id.* at 506.

Following *Hamilton*, the Supreme Court also addressed the standard, holding that "[a]lthough an employee must show some harm … to prevail in a Title VII suit, she need not show that the injury satisfies a significance test." *Muldrow*, 601 U.S. at 350, *see also Yates v. Spring Indep. Sch. Dist.*, No. 23-20441, 2024 WL 3928095, at *4 (5th Cir. Aug. 26, 2024) (citing *Muldrow* for this proposition).  While the Court did not define exactly how much harm must be shown, it declined to apply the lower standard applicable in retaliation cases, holding that even requiring that an employment action be "materially adverse" would be inappropriate in the discrimination context. *Muldrow*, 601 U.S. at 357-58.  In contrast to retaliation, the anti-discrimination laws prevent injury to individuals based on status, "without distinguishing between significant and less significant harms." *Id.* at 358.  The Court reiterated that any injury must still affect the terms and conditions of employment, and noted that "a court may consider whether a less harmful act is, in a given

context, less suggestive of intentional discrimination," thus failing to meet the requirement that the action be "because of" a protected trait. *Id.*

An employee may be "constructively discharged" "when the employer made conditions so intolerable that the employee reasonably felt compelled to resign." *Shawgo v. Spradlin*, 701 F.2d 470, 481 (5th Cir. 1983). This question requires the court to determine "whether or not a reasonable person in the employee's position would have felt compelled to resign." *Id.* at 481 n.12. This is based solely on an analysis of the conditions imposed, not the employer's motive. *Id.* Mere harassment is insufficient to show constructive discharge absent aggravating factors, which include: "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status." *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 331-32 (5th Cir. 2004). "[T]o succeed on a constructive discharge claim, the plaintiff must show a greater degree of harassment than is required for a hostile work environment claim." *Id.* at 332.

After the employee makes a prima facie case of discrimination, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for the adverse action. *Watkins v. Tregre*, 997 F.3d 275, 282 (5th Cir. 2021). The employer carries only the burden of production at this stage, not a burden of persuasion, and the employer must "articulate a

nondiscriminatory reason with sufficient clarity to afford [the employee] a realistic opportunity to show that the reason is pretextual." *Id.* (internal citation omitted). Poor work performance is an adequate nondiscriminatory reason if specific examples are provided. *Id.*

After the employer meets its burden to show a legitimate, non-discriminatory reason for the adverse action, the burden shifts back to the employee to show that this reason was merely a pretext for discrimination. *Id.* To do so, the employee must produce substantial evidence that the proffered reason is discriminatory, which requires evidence "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.* at 283 (internal citation omitted). An employee may establish pretext either by showing disparate treatment or by showing that the proffered explanation is false or "unworthy of credence." *Id.* "[E]vidence must be of sufficient nature, extent, and quality to permit a jury to reasonably infer discrimination." *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 826 (5th Cir. 2022) (internal quotation marks omitted). An employer's lack of contemporaneous documentation of alleged work deficiencies can be sufficient to show that the non-discriminatory reason is pretextual. *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 239 (5th Cir. 2015). To establish pretext through disparate treatment, an employee must produce evidence of a comparator who was similarly situated to her. *Owens*, 33 F.4th at 827. A showing that another employee is similarly situated must be based on more than merely job titles. Conclusory declarations from the plaintiff are not sufficient to create an issue of fact, and the plaintiff

must have some factual basis to support her conclusions. *Id.* The employment actions at issue must be taken "under nearly identical circumstances." *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009).

Section 1981 applies to more than the employment context, and although it "does not provide a general cause of action for race discrimination," it does prohibit "intentional race discrimination with respect to" a plaintiff's ability "to make and enforce contracts on nondiscriminatory terms." *Arguello v. Conoco, Inc.*, 330 F.3d 355, 358 (5th Cir. 2003) (internal quotation marks omitted). "To succeed on a § 1981 claim, plaintiffs must show that (1) they are members of a protected class; (2) defendants intended to discriminate on the basis of that protected class; and (3) the discrimination concerned one or more of the activities enumerated in the statute." *Abdallah v. Mesa Air Grp., Inc.*, 83 F.4th 1006, 1013 (5th Cir. 2023) (internal quotation marks and brackets omitted). "Plaintiffs can show discrimination in two ways: disparate treatment and disparate impact." *Id.* As relevant here, disparate treatment describes "actions that treat a plaintiff worse than others based on [her] race, color, religion, sex, or national origin." *Id.* (internal brackets omitted). Where the plaintiff alleges that the defendant interfered with their right to contract by preventing them from purchasing a service, the plaintiff must show that they were actually prevented, not merely deterred, from receiving service. *Arguello*, 330 F.3d at 358-59.

Here, Brenyah has not established a genuine issue of material fact regarding her Title VII and § 1981 race and national origin discrimination claims. First, as to her prima facie case of discrimination, the majority of the actions that Brenyah identifies do not

qualify as adverse employment actions even under the new legal standard and, therefore, are insufficient to establish a prima facie case. First, CCMC's denial of light duty work will be addressed below in the analysis of her ADA claim. Second, as to the alleged denial of medical care and the calling of security and the police during the August 2017 incident at Doctors Regional, Brenyah has not established that these were employment actions. It is undisputed that, although CCMC and Doctors Regional were part of the same system and shared some staff, Brenyah did not work at Doctors Regional outside of attending some training there and she was not at the hospital on August 25, 2017, in her capacity as an employee, but rather to seek treatment. (*See, e.g.,* D.E. 140-7 at 32-34). Further, Brenyah has not presented any evidence showing that the incident affected the "terms, conditions, or privileges of employment," as is required to show an adverse employment action. *Hamilton*, 79 F.4th at 506. There is no evidence in the record that this incident had any effect on Brenyah's employment, and although Sewell indicated in an e-mail that he was going to issue a disciplinary action for the incident, there is no evidence in the record that this occurred. (D.E. 104-28). Brenyah never returned to work after the incident.

Finally, as to CCMC's failure to return Brenyah to work and constructive discharge, Brenyah has not established a genuine issue of material fact as to either allegation. The evidence shows that Brenyah, Sewell, and Smith discussed her return to work from early January to mid-March 2018. (D.E. 104-30, D.E. 104-32, D.E. 104-33, D.E. 104-34, D.E. 104-35, D.E. 104-37D.E. 140-93). Throughout this period, the evidence indicates that both parties went days without responding to each other in several instances, and Brenyah

continually delayed her return to work so she could complete more training and an orientation, which CCMC allowed. (*See id.*). Sewell first told Brenyah on January 9, 2018, that she had online training courses to complete before she could return. (D.E. 104-32 at 3). Brenyah did not complete these assignments until February 26, 2018. (D.E. 104-35 at 3). The final communication between Sewell and Brenyah in the record is a text from Sewell telling her that the hospital needed her to return, to which Brenyah responded that she had mailed a letter alleging constructive discharge the day earlier and would not be returning. (D.E. 104-35 at 4). In short, the evidence shows, at most, that both parties were slow to come to terms on Brenyah's return, but does not show that CCMC refused to return her to work. As to Brenyah's argument that her other discrimination allegations constitute constructive discharge, she has shown only mere harassment, which is insufficient to establish constructive discharge. *Hockman*, 407 F.3d at 331-32. Accordingly, to the extent that Brenyah relies on these actions to establish a prima facie case, she has failed to establish a genuine issue of material fact.

Under the new, lower standard established in *Hamilton* and *Muldrow*, the extension of Brenyah's probationary period could qualify as an adverse action. However, even if the court were to conclude that it qualified and that Brenyah otherwise established a prima facie case of discrimination, she has not established that CCMC's legitimate, non-discriminatory reason for extending her probationary period was merely a pretext. CCMC argues, and the record indicates, that the primary reason for the extension was bad time management. (D.E. 104-17 at 2). The record shows that Zamora brought up time

management to Brenyah at least two times before the end of her probationary period. (D.E. 104-18 at 2-3, 5-6). Moreover, Brenyah's time records show that she extended her shift by at least an hour on 44 of 54 shifts. (D.E. 104-19 at 2-5). Brenyah has not submitted any evidence of an employee with a comparable record who was treated differently. She argues that Casas and Martinez sometimes stayed over an hour after their shifts, but the combined time records for those two nurses show they extended their shift by at least an hour only 11 times out of 68 shifts. (D.E. 142-24 at 2-4). Poor work performance is a legitimate, non-discriminatory reason for an adverse employment action, and CCMC provided specific evidence of Brenyah's time management issues. *Watkins*, 997 F.3d at 282. To the extent that Brenyah argues that the decision to extend her probationary period was made too late because it was done roughly a week after the first 90-day period expired, the CBA does not define when CCMC was required to extend the probationary period. (D.E. 104-7 at 27). To the extent that Brenyah argues that she had no disciplinary actions in her record at the time, the CBA does not require disciplinary actions in order for CCMC to extend an employee's probationary period. (*Id.*). Thus, even if Brenyah could establish a prima facie case of retaliation based on the extension of her probationary period, she has not established that CCMC's non-discriminatory reason was merely pretextual.

Finally, as Brenyah's § 1981 claim based on the denial of medical services in her role as a patient during the August 2017 incident at Doctors Regional, Brenyah has not shown that she was prevented from obtaining service. *Arguello*, 330 F.3d at 358-59. Brenyah was seen in the emergency room, was given a prescription for medication, and

was given materials regarding how to treat her back pain.  (D.E. 142-33 at 14-17).  Brenyah

has not established a genuine issue of material fact that she was prevented, as opposed to

merely deterred, from obtaining service.

Accordingly, it is recommended that Brenyah's Title VII and § 1981 race and

national origin discrimination claims be denied.

### c.     Hostile Work Environment Under § 1981 and Title VII

CCMC next argues that Brenyah cannot prove a hostile work environment claim

under § 1981 or Title VII because she cannot show that any alleged harassment affected a

term, condition, or privilege of her employment.  (D.E. 104 at 21).  CCMC contends that

Brenyah has identified, at most, only offensive utterances, which are insufficient to

establish a hostile work environment, and that these statements were primarily directed at

other people.  (*Id.* at 22-23).  CCMC argues that the incident at Doctors Regional cannot

form the basis of a hostile work environment claim because that hospital was not Brenyah's

working environment, she was not there in her capacity as an employee, and she never

returned to work after the incident.  (*Id.* at 23).  Alternatively, CCMC asserts that, even if

Brenyah could show that harassment affected a term, condition, or privilege of her

employment, she cannot show that CCMC failed to take prompt remedial action because

the evidence shows that Sewell and Goodwine immediately investigated Brenyah's

allegations and addressed the comments with those who made them.  (*Id.* at 24).

Brenyah responds that the incidents that caused the hostile work environment

occurred several times a week and included race-based policies that required nurses to stay

12 feet apart based on race, allowed patients to choose caregivers based on race, applied different standards based on race, and allowed derogatory comments based on race. (D.E. 107 at 23-25). Brenyah argues that there is a genuine issue of material fact regarding whether CCMC conducted an investigation based on Sewell's and Goodwine's testimony, the lack of written investigation notes, the fact that not all black employees were interviewed, and various other discrepancies. (*Id.* at 25-26). Finally, as to the August 10 disciplinary action for allegedly being rude to a patient, Brenyah contends that CCMC ignored evidence favorable to her, including, among other things, that the patient said a different nurse was rude, this other nurse received no discipline or coaching, and Brenyah continued caring for the patient, who was happy with her care. (*Id.* at 26-27).

In reply, CCMC reiterates its original arguments. (D.E. 116 at 7-8).

"Hostile work environment is a specific discrimination claim under Title VII." *Hudson v. Lincare, Inc.*, 58 F.4th 222, 229 (5th Cir. 2023). "When a workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Id.* (internal quotation marks and citations omitted). "To establish a claim of hostile work environment, a plaintiff must prove [s]he (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on [her] membership in the protected group; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to

take prompt remedial action." *Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 399-400 (5th Cir. 2021).

"Harassment is sufficiently severe or pervasive enough to create a hostile work environment when it is objectively hostile or abusive—meaning an environment that a reasonable person would find hostile or abusive—and is subjectively perceived by the victim as abusive." *Id.* at 400 (internal quotation marks and citations omitted). The objective inquiry must consider all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). A "company's desire to cater to the perceived racial preferences of its customers is not a defense under Title VII for treating employees differently based on race." *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 913 (7th Cir. 2010).

However, Title VII is not a "general civility code," and "simple teasing," offhand comments, and isolated incidents are not sufficient to alter the terms and conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Wantou v. Wal-Mart Stores Texas, L.L.C.*, 23 F.4th 422, 433 (5th Cir. 2022). Further, second-hand harassment, although relevant, is "less objectionable than harassment directed at the plaintiff." *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005). Any allegedly harassing comments must affect the employee's working environment in the workplace, and the Fifth Circuit has found that comments made over the phone or in writing

while an employee is not at work are not sufficient. *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 510-11 (5th Cir. 2003).

Here, Brenyah has not established that she suffered from harassment so severe or pervasive that it altered the conditions of her employment and affected a term, condition, or privilege of her employment. The evidence shows that Brenyah was subjected to several offensive utterances at work, including complaints about the smell of her African food, statements by coworkers that they preferred Filipino nurses to black nurses, a statement by a coworker that a black nurse was no longer black because he married a Filipino and/or visited the Philippines regularly, and was asked to repeat herself often because of her accent. (D.E. 104-7 at 98-99, 101). These comments, despite occurring relatively often during Brenyah's shifts, were mere offensive utterances and were not physically threatening or humiliating. *Harris*, 510 U.S. at 23. There is also no evidence that they affected Brenyah's work performance. *Id.* To the extent Brenyah relies on the August 2017 incident at Doctors Regional to support her hostile work environment claim, that incident did not occur at Brenyah's workplace or in her capacity as an employee and she has not shown that it affected a term, condition, or privilege of her employment. *Johnson*; *Gowesky*, 321 F.3d at 510-11. Finally, the evidence does show that Dike suffered more severe harassment, including having his assignments changed due to his race and being asked to give another employee 12 feet of distance due to his culture. (*See, e.g.,* D.E. 104-7 at 98-99, 101, 115, 119). However, Brenyah experienced these only second-hand and has not alleged or submitted any evidence showing that her patient assignments were

changed due to her race or that she was asked to give distance to other employees due to her culture. *Moser*, 406 F.3d at 903.

Accordingly, it is recommended that Brenyah's hostile work environment claim be denied.

### d.    Disability Discrimination and Failure to Accommodate Under the ADA

Next, CCMC argues that it was not required to create or offer a light duty position as an accommodation and that the restrictions provided by Brenyah's doctor prevented her from completing the essential functions of her job. (D.E. 104 at 30-31). Accordingly, CCMC argues that Brenyah cannot establish a failure-to-accommodate claim because she could not complete the essential functions of her job and identified no accommodation that would allow her to perform those functions. (*Id.* at 31). As to disability discrimination, CCMC argues that Brenyah cannot show any adverse employment action under the ADA for the same reasons as under § 1981 and Title VII. (*Id.* at 32).

Brenyah responds that CCMC failed to engage in the interactive process when she requested light duty work. (D.E. 107 at 30). She argues that Sewell and Goodwine provided contradicting testimony regarding whether she could have been eligible for light duty work, which creates a fact issue. (*Id.* at 31). Brenyah asserts that CCMC was required to move her to a vacant position or otherwise modify its policies to accommodate her and that placement on leave is not a sufficient accommodation. (*Id.*). She argues that CCMC also harassed her by denying her medical care at Doctors Regional. (*Id.* at 32). Finally, Brenyah contends that CCMC did not address her interference claim under the ADA. (*Id.*).

CCMC replies that, based on the limitations her doctor identified, Brenyah was not able to perform the essential functions of an RN, and any light duty assignment would have removed essential functions, which CCMC was not required to do.  (D.E. 116 at 9-10). CCMC argues that Brenyah has not identified any equivalent position she could have been moved to.  (*Id.* at 10).  Finally, CCMC argues that Brenyah has not pled a claim under Title III of the ADA that CCMC interfered with her ability to receive medical care as a patient, but rather only pled claims under Title I and Title V of the ADA.  (*Id.*).

"No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  To make out a prima facie case of disability discrimination, a plaintiff must show that: (1) she suffers from a disability; (2) she is qualified for the job; and (3) she was subject to an adverse employment decision on account of her disability.  *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 695 (5th Cir. 2014).

To avoid summary judgment under the second prong, a plaintiff must show either that she could perform the essential functions of her job despite her disability, or that a reasonable accommodation would have enabled her to perform the essential functions of her job.  *Id.*  "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."  *Id.*  It is discriminatory for an employer to

not make "reasonable accommodations to the known physical … limitations of an otherwise qualified individual with a disability" unless the employer can show "that the accommodation would impose an undue hardship on the operation of the business."  42 U.S.C. § 12112(b)(5)(A).

Once an employee requests an accommodation, the employer is required to participate in an interactive process to determine what reasonable accommodations might be available.  *LHC*, 773 F.3d at 699.  The "ADA does not provide a right to an employee's preferred accommodation but only to a reasonable accommodation."  *Kitchen v. BASF*, 952 F.3d 247, 254 (5th Cir. 2020).   A reasonable accommodation can include "job restructuring, part-time or modified work schedules, reassignment to a vacant position," and "other similar accommodations for individuals with disabilities," among other possibilities.  42 U.S.C. § 12111(9).  Placement on unpaid leave can be discriminatory or can be a reasonable accommodation depending on context.  *Dawson v. Akal Sec. Inc.*, 660 F. App'x 504, 506 (9th Cir. 2016).  "The ADA does not require an employer to relieve an employee of any essential functions of his or her job, modify those duties, reassign existing employees to perform those jobs, or hire new employees to do so."  *Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999).  If an employee seeks reassignment to another vacant position, she must show that she is qualified for that position.  *Id.* at 622. "An employer is not required to create 'light duty' jobs to accommodate."  *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 809 (5th Cir. 1997).

The ADA also makes it "unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of … any right granted or protected" by the statute.  42 U.S.C. § 12203(b).  This provision can apply to any of the first three titles of the ADA, which apply to employment, government services, and public accommodations, depending on what the plaintiff has alleged.  *Post v. Trinity Health-Michigan*, 44 F.4th 572, 576 (6th Cir. 2022).

Here, Brenyah has not established a genuine issue of material fact regarding her ADA failure-to-accommodate and disability discrimination claim.  As to a failure to accommodate, CCMC was not required to create a light duty position for Brenyah. *Foreman*, 117 F.3d at 809.  Moreover, the evidence shows that, based on Brenyah's doctor's recommendations, she was unable to perform the lifting and other physical requirements of the position, which were essential functions.  (D.E. 104-23 at 2, 12; D.E. 104-26 at 2-3; D.E. 105-2 at 3).  Brenyah has not established that she could complete the essential functions of her job given her injuries, with or without an accommodation.  *Burch*, 174 F.3d at 621.  Moreover, Brenyah has not shown that there was a vacant position that she could have been reassigned to and that she was qualified for.  *Id.* at 622.  Brenyah has not established that she was qualified for the charge nurse position, nor has she established that a unit secretary position is equivalent to a floor nurse position.  Finally, Brenyah has not identified any specific comparator who was given light duty, reassigned, or otherwise treated differently.  She has submitted an undated text from Tyrel-Christie stating that a

pregnant nurse was given light duty work until giving birth, with no other detail.  (D.E. 140-114 at 2).  This is insufficient to show disparate treatment.

To the extent that Brenyah raises a disparate treatment discrimination claim under the ADA beyond a failure to accommodate, she has either not shown an adverse employment action for the same reasons as discussed above.  *See LHC Grp.*, 773 F.3d at 695 (discussing the factors necessary to show a prima facie case of disability discrimination).  The extension of her probationary period occurred before the onset of her disability and, therefore, she cannot establish causation based on that action.

Finally, Brenyah has not properly pled a claim that CCMC interfered with her ability to receive medical care as a patient.  In her complaint, Brenyah specifically alleges that CCMC "engaged in unlawful employment practices in violation of Title I and Title V of the [ADA]."  (D.E. 71 at 39).  Title I of the ADA applies to employers, while Title V provides for the prohibition against retaliation and interference.  Brenyah makes no mention of Title III, which applies to public accommodations, in her complaint.  (*See generally* D.E. 71).  Brenyah specifically cites paragraphs 1, 82, and 83 of her complaint as the basis for this claim, but the allegations in these paragraphs do not clearly delineate a Title III claim separate from her employment-based Title I claims.  (*See id.* at 1-2, 39-41; D.E. 107 at 32).  However, Brenyah has properly raised interference and retaliation claims under Title I and Title V of the ADA in relation to her employment, which will be addressed below.

Accordingly, it is recommended that CCMC's motion for summary judgment be granted regarding Brenyah's disability discrimination and failure-to-accommodate claims under the ADA.

### e.    Retaliation Under § 1981, Title VII, and the ADA

CCMC next contends that, as with Brenyah's underlying discrimination claims, she cannot establish a retaliation claim because she cannot show that she suffered an adverse employment action. (D.E. 104 at 25-26, 32). In particular, CCMC argues that the extended probationary period and the August 2017 disciplinary action were not adverse employment actions because they did not affect Brenyah's compensation, benefits, duties, or job title, and neither served as the basis for a more serious action like termination. (*Id.* at 26-27). CCMC contends that the incident at Doctors Regional does not constitute an adverse employment action because it occurred while she was on medical leave and seeking treatment as a patient, not in her capacity as an employee. (*Id.* at 27). CCMC reiterates that Brenyah cannot show that she was constructively discharged. (*Id.* at 27-28). Alternatively, CCMC argues that, even if Brenyah could show an adverse employment action, she cannot show that a protected activity was the but-for cause of that action. (*Id.* at 28-29). Finally, CCMC reiterates that, even if Brenyah could prove a prima facie case of retaliation, she cannot prove that CCMC's legitimate, non-discriminatory reasons for the adverse actions were merely pretextual. (*Id.* at 29-30).

Brenyah responds that she has shown all the elements of a prima facie case of retaliation, including that she suffered an adverse employment action and that her protected

action was the cause of the adverse action.  (D.E. 107 at 28-29).  Specifically, Brenyah argues that: (1) she received her first coaching days after reporting racial harassment; (2) Sewell asked about terminating Brenyah or extending her probationary period the day after meeting about the discrimination investigation; (3) Sewell disciplined her on August 10 soon after learning about her ethics complaint; and (4) Sewell denied her light duty work within two weeks of learning of her ethics complaint.  (*Id.* at 29).  Brenyah argues that the extension of her probationary period qualifies as an adverse action because, like being placed on a performance improvement plan, it could dissuade a reasonable employee from engaging in protected activity.  (*Id.*).

CCMC replies that binding Fifth Circuit precedent establishes that write-ups are not adverse employment actions for retaliation purposes.  (D.E. 116 at 9).  CCMC reiterates that none of the other retaliatory actions Brenyah identifies qualify as adverse employment actions.  (*Id.*).

To make out a prima facie case of retaliation under § 1981, Title VII, and the ADA, a plaintiff must show: (1) that she engaged in activity protected by the statute; (2) that an adverse employment action occurred; and (3) that a causal link existed between the protected activity and the adverse employment action.  *See Willis v. Cleo Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (Section 1981 and Title VII retaliation); *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 304 (5th Cir. 2020) (ADA retaliation).  "If the employee establishes a prima facie case of retaliation, the employer must come forward with a legitimate, nondiscriminatory reason for its action."  *Lyons*, 964 F.3d at 304.  "If the employer meets

its burden of production, the employee must then demonstrate that the proffered reason is a pretext for retaliation." *Id.*

In order for an employment action to be materially adverse, the plaintiff must show that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal citation and quotation marks omitted). The statutes do not protect against all "petty slights or minor annoyances that often take place at work and that all employees experience." Instead, the protection is offered against employer actions that are "likely to deter victims of discrimination from complaining" of it. *Id.* "[A]n employment decision tends to be 'materially adverse' when it changes job title, grade, hours, salary, or benefits or effects a diminution in prestige or change in standing among co-workers." *Hudson v. Lincare, Inc.*, 58 F.4th 222, 231 (5th Cir. 2023) (internal quotation marks and ellipses omitted). This is not limited to workplace-related or employment-related acts. *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 945 (5th Cir. 2015). However, an "employment decision is not an adverse action if it does not objectively worsen the employee's working conditions." *Lincare*, 58 F.4th at 232. Written warnings are not materially adverse. *Simmons-Myers v. Caesars Ent. Corp.*, 515 F. App'x 269, 275 (5th Cir. 2013).

A causal link is established where the employer's materially adverse action was "based in part on knowledge of the employee's protected activity." *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001). This element is satisfied where the

employment decision and the protected activity were not wholly unrelated.  *Id.* (favorably citing *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.1985)). "The existence of a causal link may be determined by examining three factors: (1) the employee's past disciplinary record; (2) whether the employer followed its usual disciplinary procedures when taking the adverse action; and (3) the temporal relationship between the protected activity and the adverse action." *Pollak v. Lew*, No. CIV.A. H-11-2550, 2013 WL 1194848, at *10 (S.D. Tex. Mar. 22, 2013) (citing *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 507–08 (5th Cir.1994)).  A plaintiff can meet the burden of showing causation at this stage by showing close enough timing between her protected activity and the adverse employment action.  *Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019).

Here, Brenyah has not established that she suffered a materially adverse employment action, and therefore has not established a prima facie case of retaliation under any of the statutes.  To the extent she relies on the denial of light duty work, a refusal to return her to work, or constructive discharge, those are insufficient for the same reasons discussed above.  To the extent she relies on the August 2017 disciplinary action, written warnings are not materially adverse.  *Simmons-Myers*, 515 F. App'x at 275.  To the extent she relies on the denial of medical care and the calling of security and the police in the August 2017 incident at Doctors Regional, Brenyah has not established that these objectively worsened her working conditions where they did not occur at her workplace, she did not receive any discipline from them, and she never returned from sick leave after

them. *Lincare*, 58 F.4th at 232. Finally, as above, to the extent Brenyah relies on the extension of her probationary period as an adverse employment action, she cannot show that CCMC's legitimate, non-discriminatory reason for the action was merely a pretext.

Accordingly, it is recommended that Brenyah's retaliation claims be denied.

### f.    Other Arguments

Because the undersigned recommends granting CCMC's motion for summary judgment on each of Brenyah's claims on the merits, this memorandum does not address CCMC's arguments of failure to exhaust and failure to mitigate damages.

## V.    RECOMMENDATION

Accordingly, it is recommended that: (1) Brenyah's evidentiary objections be **OVERRULED** in part and **SUSTAINED** in part; (2) CCMC's motion for summary judgment (D.E. 104) be **GRANTED**; and (3) CCMC's motion to strike (D.E. 118) be **DENIED as moot**.

Respectfully submitted on October 7, 2024.

Julie K. Hampton
United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).